# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### PIKES PEAK POWER CO. v. CITY OF COLORADO SPRINGS.

(Circuit Court of Appeals, Eighth Circuit. November 5, 1900.)

No. 1,413.

1. CIRCUIT COURTS OF APPEALS—JURISDICTION OF CONSTITUTIONAL QUESTIONS OPTIONAL.

In any case in which the constitution or law of a state is claimed to be in contravention of the constitution of the United States the circuit courts of appeals may either (1) decline to take jurisdiction, or (2), where other questions are involved, take jurisdiction, and certify the constitutional question to the supreme court, or (3) take jurisdiction, and decide the whole case in the first instance. 26 Stat. 826, c. 517; Carter v. Roberts, 20 Sup. Ct. 713, 177 U. S. 500, 44 L. Ed. 861.

2. SAME.

Where a dismissal of an appeal would cause a delay of years in the decision of a case of considerable importance which involves a constitutional question, the circuit court of appeals takes jurisdiction, and decides the whole case in the first instance.

3. MUNICIPALITY—USE OF WATER SYSTEM AND STREETS BY PRIVATE PARTIES —TRANSMISSION OF ELECTRICITY.

In September, 1898, a city passed an ordinance granting to J. and his assigns the right for a term of 25 years to use the water and water system of the city to produce power to generate electricity, and the right to lay conduits, to erect poles, to string wires, and to maintain and operate them in its streets during this term, on condition that the grantees would return the water to the system undiminished in flow, and without pollution; that they would do nothing to impair the efficiency of the water system; that they would complete the driving of a tunnel through a spur of a mountain for the city for the purpose of enlarging its water system and its supply of water; that they would carry its telegraph and telephone wires in their conduits and on their poles, and would furnish the city with a certain amount of electric power and certain electric lights free of cost, and with others at a fixed price during the term of the grant, and that at the end of the term they would vest in the city the ownership of a certain pipe line and any electrical plant they had then constructed to supply the electric lights. *Held*, that under the general power to manage and control the property of the city, to light its streets and public places, to manage its water system, and to control and regulate the use of its streets, the city council of the city had lawful authority to pass this ordinance.

105 F.—1

**4. SAME—ACCEPTANCE OF ORDINANCE—REPEAL.**
After the ordinance of September, 1898, had been accepted, and after the grantees had proceeded in the performance of their part of the contract for five months, the city council, in February, 1899, passed an ordinance which, by its terms, repealed the ordinance of September, 1898. *Held*, the repealing ordinance violated section 10, art. 1, of the constitution, which prohibits the passage of a law impairing the obligation of contracts, and the fourteenth amendment to the constitution, which forbids the taking of property without due process of law.

**5. SAME—CONSTITUTIONAL LAW.**
An ordinance of a city passed under the legislative authority of a state is a law of that state, within the meaning of that term in the constitution and statutes of the United States.

**6. SAME—GRANT FOR PRIVATE USE.**
A grant by a city of rights and privileges in its streets, parks, public grounds, or water system for private use,—that is to say, a grant from which neither the city, its citizens, nor the public receive any consideration or derive any benefit,—is beyond the powers of the municipality, and void.

**7. SAME—GRANT FOR PUBLIC PURPOSES.**
A city has authority, under its general powers, to grant to private parties for public purposes reasonable rights and privileges in its water system, its streets, its public grounds, and its other public utilities, provided that such grant and its exercise do not materially impair the usefulness of these utilities for the public purposes for which they were acquired or dedicated.

**8. SAME.**
The ordinance of September, 1898, was not for purely private use, but for the public purposes of procuring an enlargement of the water system of the city, of obtaining the use of electric lights for the municipality, and of securing conduits and poles to carry its wires.

**9. SAME—PRIVATE ELECTRIC LIGHT PLANTS.**
The Colorado statute (3 Mills' Ann. St. p. 1144) which provides that the city councils of cities in that state shall have power to erect waterworks, gas works, or electric light works, or to authorize their erection by others, only when such works shall be erected or authorized pursuant to a favorable vote of the taxpayers of the cities, applies only to works erected by the cities themselves or by others under contracts with or for the cities. It has no application to such works erected by private parties for their own use.

**10. SAME—POWERS.**
A city has two classes of powers, the one legislative, public, governmental, in the exercise of which it acts as a sovereign and governs its people, the other proprietary, quasi private, business, conferred upon it for the private advantage of its inhabitants and itself.

**11. SAME—EXERCISE OF ITS BUSINESS POWERS.**
In contracting for the enlargement of its water system, for electric lights for municipal use, and for the use of conduits and poles to carry its wires, a municipality is exercising its proprietary or business powers, is subject to the same rules of law that govern the agreements of private corporations, and its contracts bind its successive sets of officers.

**12. SAME—CONTROL OF PUBLIC UTILITIES.**
The water system and the other public utilities of a city are held by the municipality and its officers in trust for the public purposes for which they were acquired and dedicated. The city and its officers may not renounce this trust, disable themselves from discharging it, or so divert or impair the public utilities that they become inadequate to accomplish the public purposes for which they were created.

**13. SAME—UTILITIES CREATED FOR PUBLIC PURPOSES.**
A city and its officers have the authority, and it is their duty, to apply the surplus power and use of public utilities for the benefit of the munic-

ipality and its citizens, provided such application does not materially impair their usefulness for the public purposes for which they were created.

14. SAME.

A city council has authority, under its general powers, to lease to private parties the use of the water flowing through its water system to enable them to generate power to create electricity, where such lease does not impair the usefulness of the water or the system for the municipal purposes for which they were obtained by the city.

15. CONTRACTS — DELAY IN PERFORMANCE — FORFEITURE — ENFORCEMENT IN EQUITY.

A court of equity will not enforce a forfeiture of the rights and privileges of the grantees in a contract for their failure to complete their performance of it in time, where the party seeking the forfeiture was guilty of the first breach of the agreement, and failed to pay installments due under it while the work was in progress until compelled to do so by judgments of the courts, and had persistently endeavored to revoke and annul the grant, while the grantees were vigorously prosecuting their part of the work under it, which they had, within the time limited by the agreement, substantially performed, although they had not completely finished it.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Colorado.

Guy Le R. Stevick and Charles J. Hughes, Jr. (Henry M. Blackmer and Henry McAllister, Jr., on the brief), for appellant.

W. S. Morris and R. E. Lewis (J. W. Ady, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This is an appeal from a decree dismissing the bill of the Pikes Peak Power Company, a corporation, upon the merits at the final hearing. The suit which culminated in that decree arose in this way: For many years the city of Colorado Springs, the appellee, has derived its supply of water from watersheds on the slopes of Pikes Peak some 19 miles from the city, and more than 6,000 feet above the level of the sea. The city owns more than 4,000 acres of land on these slopes, and it collects the water from rains and melting snows into reservoirs in the mountains, and by open flumes and iron pipes conducts it thence to the city, where it is distributed for the usual municipal purposes. The population and business of the city had so increased in 1895 that the supply of water which it had theretofore drawn from the eastern slopes of Pikes Peak was inadequate, and the city concluded to increase it by deriving an additional store from the western slopes of the mountain. The means devised to accomplish this purpose consisted of a reservoir on West Beaver creek for the collection of the water on the western slopes, and a tunnel at an elevation of about 11,500 feet above the level of the sea, about 6,400 feet in length, through one of the spurs of the mountain, to conduct the water to Middle Beaver creek on the easterly side of the peak, whence it would flow into the flumes and water pipes of the city. Thereupon, on December 27, 1895, Wilson & Jackson, a partnership composed of Charles H. Wilson and George W. Jackson, made a contract with the city to bore this tunnel on or before September 27, 1897. They entered upon the undertaking, but it proved to be far more difficult and expensive than any of

the parties had anticipated. A slide of loose rock, or a cave-in, was encountered on the line of the tunnel, which proved an insuperable obstacle to its construction on that line, and compelled the contractors to drive the tunnel on a detour more than 350 feet in length, while the distance on the line of the tunnel from the point of departure from it to that of the return to it was only about 130 feet. The high altitude at which the tunnel was located, the difficulty of transporting fuel, tools, and materials to that height, and developing power to drive and complete it, made its cost several times its contract price. As these obstacles developed, the city aided the contractors by a gift of $11,500, and by extending the time for the completion of the work until September 27, 1898. George W. Jackson became the successor of Wilson & Jackson, borrowed money, and apparently prosecuted the work of driving the tunnel to the best of his ability; but the undertaking became so expensive, and the amount of his indebtedness so great, that he was financially unable to carry it on without further assistance, and in the early days of September, 1898, it was evident that he could not complete it in the time or on the terms specified in the original contract, and its extension, and that he could not complete it in any way unless he could acquire some rights or privileges upon which he could get credit and borrow money to continue the work. While the contract price of the tunnel was only about $90,000, it had then cost more than twice that amount, and, if he had then abandoned it, it would have cost the city more than $100,000 to complete it. In driving the tunnel, Jackson had used electrical power, which he had created on the side of the mountain at an electrical plant of 200 horse power by the use of the water flowing down the mountain side which was subsequently led into the water system of the city of Colorado Springs, and distributed to its inhabitants. In this way he had learned that it was practicable to use this water for the development of electrical power without wasting or polluting it. In this state of the case, the city of Colorado Springs, by the passage of an ordinance on September 8, 1898, which was accepted by Jackson on September 10, 1898, made a grant to and an agreement with him which provided that the respective parties thereto should derive the following considerations or benefits therefrom: The city granted to Jackson, his associates or assigns, for the term of 25 years from September 8, 1898: (1) The right and privilege of laying, maintaining, and operating such conduits, cables, and wires in the streets and alleys within the fire limits of the city, and of erecting, maintaining, and operating such poles and wires in the streets and alleys of the city outside its fire limits as should be necessary for the transmission and sale to the city and its inhabitants of electricity for the development of electrical power, and the right and privilege of renting space in the conduits. (2) The right and privilege of constructing, maintaining, and operating at suitable places on the lands of the city and through the lands, rights of way, streams, reservoirs, flumes, ditches, pipe lines, and conduits of the water system of the city, dams, reservoirs, pipe lines, conduits, power houses, plants, poles, wires, and cables for the transfer and transmission of electrical power, together with the right to

use from such lands such earth, stones, and dead timber as might be needed to construct such power houses, reservoirs, plants, and dams. (3) The right to divert and use for the generation of electrical power all the water of any streams, ditches, flumes, pipe lines, conduits, and reservoirs of the city on condition that all water so diverted should be returned to the water system of the city unimpaired; that the use thereof under the contract should not diminish the flow of nor pollute the water; that the city should determine what constituted waste and pollution; that Jackson, his associates and assigns, should do nothing which would interfere with the successful operation of the city's system of waterworks; that the work under the contract in the city should be done under the supervision of the city, and that the city reserved its right to exercise its police power over the conduits, poles, and wires provided for by the contract. The consideration or the benefits which Jackson, his associates or assigns, agreed by this contract to bestow upon the city in return for this grant were: (1) The completion of the tunnel on or before December 8, 1899, on the terms specified in the original contract of 1895. (2) The necessary space in all the conduits they should lay, and on all the poles they should erect, for the telegraph and telephone wires of the city, and freedom of access and facilities for placing and removing them equal to those which Jackson and his associates or assigns should enjoy. (3) During the time between one year after the completion of the tunnel and September 9, 1923, such electric lights as should be necessary for lighting the public buildings of the city, not exceeding 5 arc lights of 2,000 candle power and 200 incandescent lights of 16 candle power; and such electrical power as should be necessary for municipal purposes, not exceeding 50 horse power, free of cost; and such arc lights of 2,000 candle power as should be necessary for lighting the streets, alleys, and public grounds of the city for $5.50 per light per month. (4) On September 9, 1923, any electrical plant to furnish these lights and this power and any transforming station, wires, cables, and other improvements which Jackson, his associates or assigns, shall have then constructed, strung, or made for the purpose of transforming and delivering the electricity necessary to furnish these lights and this power, and a 20-inch water pipe line from Lake Moraine to some point in the town of Manitou. On the faith and credit of this contract Jackson borrowed of various parties more than $80,000, pledged his rights and privileges under the ordinance to secure his debts for this amount, and proceeded with the construction of the tunnel. He organized the Pikes Peak Power Company, the appellant, and on January 16, 1899, assigned to it all his rights and privileges under his contract for stock in that corporation, which he pledged to secure the money he had borrowed. In this state of the facts, after Jackson had borrowed this money, and proceeded on the faith of the contract with the work of driving the tunnel through the mountain, and on February 23, 1899, the city passed an ordinance, which, by its terms, repealed the ordinance of September 8, 1898. Thereupon, on May 3, 1899, the Pikes Peak Power Company exhibited its bill in the circuit court, in which, and in an amendment to it, which it subsequently made, it set forth the

foregoing facts, and prayed that the repealing ordinance might be adjudged void as violative of the constitution of the United States, and that the city might be enjoined from interfering with the exercise by the power company of the rights and privileges granted to Jackson and his assigns by the ordinance of September 8, 1898. The city answered the amended bill. Its answer was that no rights and privileges were granted to Jackson, his associates and assigns, for various reasons, the chief of which was that the city of Colorado Springs had no power to make the contract, or to vest in any one the rights and privileges bestowed by the ordinance of September 8, 1898. On this ground the circuit court dismissed the bill at the final hearing, and this appeal challenges that ruling.

At the opening of the investigation of this case we are confronted with the claim of counsel for the appellee that this court is without jurisdiction to review the decree below, because this is a case in which the law of a state is claimed to be in contravention of the constitution of the United States. The foundation of the suit is that the city of Colorado Springs passed an ordinance which, by its terms, repealed an earlier ordinance, and thereby annulled a contract between it and the appellant, and took away the property rights of the latter without due process of law, in violation of section 10, art. 1, of, and of the fourteenth amendment to, the constitution of the United States. The answer of the city to this claim was that, while there was a contract in form, there never was any agreement in law, because the city had no power to make the contract which it assumed to effect. This defense was sustained by the court below. The appellant now insists that that court was in error because it did not hold that the city of Colorado Springs had lawful authority to make the contract, and because it did not also hold that its repealing ordinance was violative of the constitution. In this way it may be seen that this case is one in which a law of a state (for an ordinance of a city passed under the legislative authority of a state is such a law within the meaning of the federal constitution and statutes,—City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341) is claimed to be in contravention of the constitution of the United States, and that the suit involves the question whether or not this repealing ordinance is so violative of the constitution, together with other questions which must be considered and determined before the whole case can be decided. Section 5 of the act of March 3, 1891 (26 Stat. 826, c. 517), declares that appeals may be taken to the supreme court "(6) in any case in which the constitution or law of a state is claimed to be in contravention of the constitution of the United States." Section 6 provides that in cases other than those named in section 5 the circuit courts of appeals may exercise appellate jurisdiction unless otherwise provided by law. These provisions of the organic law of this court have seemed plain to us, and we have accordingly frequently held that the supreme court had exclusive jurisdiction, and that this court had no jurisdiction to review a judgment or decree in any case which was controlled by the question whether or not the constitution or law of a state was in contravention of the constitution of the United States. Merritt v. Barge Co.,

75 Fed. 813, 815, 21 C. C. A. 525, 526, 40 U. S. App. 127, 129; Hastings v. Ames, 68 Fed. 726, 728, 15 C. C. A. 628, 630, 32 U. S. App. 485, 488; Railway Co. v. Evans, 58 Fed. 433, 434, 7 C. C. A. 290, 292, 19 U. S. App. 233, 235; Pauley Jail Bldg. & Mfg. Co. v. Crawford Co., 84 Fed. 843, 942, 28 C. C. A. 579, 580, 56 U. S. App. 53, 55; Wrightman v. Boone Co., 88 Fed. 435, 437, 31 C. C. A. 570, 573, 60 U. S. App. 100, 104. We are, however, advised by two late decisions of the supreme court that our jurisdiction to review the class of cases described in the sixth subdivision of section 5 of the act of March 3, 1891, is optional with ourselves, and that we may take or decline to take jurisdiction thereof as to us seems just and proper. That court says:

"When cases arise which are controlled by the construction or application of the constitution of the United States, a direct appeal lies to this court, and if such cases are carried to the circuit courts of appeals, those courts may decline to take jurisdiction, or where such construction or application is involved with other questions, may certify the constitutional question and afterwards proceed to judgment, or may decide the whole case in the first instance." Carter v. Roberts, 177 U. S. 496, 500, 20 Sup. Ct. 713, 44 L. Ed. 861, 863; Railroad Co. v. Thiebaud, 177 U. S. 615, 620, 20 Sup. Ct. 822, 44 L. Ed. 911.

The case before us has been fully argued upon its merits. It is of much public importance. It involves the management of the water system and the lighting system of the city of Colorado Springs. The interests of the city and its inhabitants, as well as those of the power company, demand its early decision, and a dismissal of this appeal would almost inevitably lead to a delay of years in its determination. In view of these facts, we have concluded not to decline to take jurisdiction, and to proceed to "decide the whole case in the first instance."

It was not claimed in the argument of counsel for the appellee in this court, and it is not asserted in their brief, that the repealing ordinance of February 23, 1899, was not violative of the constitution of the United States if the contract evidenced by the ordinance of September 8, 1898, and its acceptance were valid, and binding upon the city. The repealing ordinance is so clearly a violation of section 10, art. 1, of that instrument, which prohibits the passage of a law impairing the obligation of contracts, and of the fourteenth amendment to the constitution, which forbids the taking of property without due process of law, that no argument to the contrary would be worthy of a moment's consideration, and no contention of that character is made. The position upon which the counsel for the city chiefly rely is that the grant of the rights and privileges found in the ordinance of September 8, 1898, was beyond the powers of the municipality, and void, so that no contract resulted from the acceptance of its terms, and no rights vested under it. In support of this contention they present numerous arguments, to which our attention will now be directed. They say that a grant by a municipality of rights and privileges in its streets, alleys, parks, and public grounds for private use is invalid; that this ordinance was a grant for such a use, and that it is, therefore, void. The major premise of this syllogism, when properly understood, and limited in its meaning, may be conceded to be sound; but the minor premise is unfounded in

fact. The grant evidenced by the ordinance of September, 1898, was not made for a purely private use. A grant for a private use is one from which neither the city nor its citizens derive any consideration or benefit. Such a grant cannot be sustained. This proposition is well illustrated by State v. Murphy, 134 Mo. 548, 565, 31 S. W. 784, 34 S. W. 51, 35 S. W. 1132, 34 L. R. A. 369, upon which, and upon other cases of a similar character, which are cited in their brief, counsel for the city seem to rely. In that case the city of St. Louis had granted to a private corporation, for the exclusive use of the latter, the right to lay and maintain in the streets of that city conduits for carrying wires and cables, and had reserved no consideration or benefit to the city or the public from the grant of the right or from its exercise. It was held that such a grant for a purely private use was beyond the powers of the municipality. That decision rested, however, on the express ground that the grantee was placed under no obligation to use the rights and privileges granted to it in any way or to any extent for the benefit of the public, and that no duty whatever to the public, the city, or the citizens was imposed upon it. The supreme court of Missouri nevertheless expressly declared in its opinion that:

"Under its general power to regulate the use of streets the city has authority to authorize corporations and persons, for the purpose of serving the public, to string telegraph, telephone, or electric light wires upon poles above the surface or through conduits beneath the surface of the streets provided such structures and mechanical appliances do not materially interfere with the ordinary uses of the streets and public travel thereon." Pages 562, 565, 566, 134 Mo., pages 786–788, 31 S. W., and pages 374, 375, 34 L. R. A.

The grant now before us falls under the rule stated in this quotation. It was not a grant for a purely private use, for the use of the grantees alone. It was not a grant which imposed no duty to the city and to the public upon Jackson, his associates and assigns. It was not a grant for which the city exacted no consideration, and from which it derived no benefit. On the other hand, the ordinance and its acceptance secured to the city and to the public the completion of the tunnel, the use of all conduits and poles of the grantees for its telegraph and telephone wires until September 8, 1923, the use of such electric lights as should be necessary to light its public buildings, not exceeding 5 arc lights of 2,000 candle power and 200 incandescent lights of 16 candle power, and of such electrical power as should be necessary for municipal purposes, not exceeding 50 horse power, free of cost, until September 8, 1923, and on that day any electrical plant which the grantees shall have then constructed to light the streets and public buildings of the city and a 20-inch water pipe line from Lake Moraine to Manitou. Here were grave duties to the public and onerous public service imposed upon the grantees in this ordinance, and ample consideration secured to the city to sustain the contract.

The arguments in which counsel have indulged to minimize and expunge the public benefits and service which the city secured by this contract have not been overlooked, but they have failed to convince. They say that Jackson was bound, under his original con-

tract of 1895, to complete the tunnel, so that his agreement to do so, evidenced by his acceptance of the ordinance of September 8, 1898, added nothing to the benefits which were already secured to the city before that acceptance was made; that the only other public service imposed by the ordinance was furnishing the city with electric lights and the erection and maintenance of a plant for that purpose, and that the ordinance was inoperative in that respect because a majority of the voters of the city who were taxpayers did not cast their ballots in favor of authorizing the erection of this plant under a clause of the statutes of Colorado found on page 1144, 3 Mills' Ann. St., which reads:

"They [city councils] shall have power to purchase or erect waterworks or electric light works; or to authorize the erection of the same by others; but no such works shall be erected or authorized until a majority of the voters of the city or town who are taxpayers under the law voting on the question at a general or special election, by vote approve the same."

But the difference to the promisee between the agreement of a man who is financially unable to perform his contract to expend $100,000 in completing it, and the agreement of the same man to do the same thing when he is financially willing and able to do it, and actually proceeds to do it, is wide and substantial, and this was the important public benefit and consideration which the city secured in the construction of the tunnel by the contract of September 8, 1898. When the ordinance of that date was passed, Jackson had exhausted his means and his credit in his attempt to drive the tunnel through the mountain under his contract of 1895, and there still was required the expenditure of about $100,000 to complete it. The contract evidenced by the ordinance gave him rights and privileges upon which he was able to borrow the money, strengthened his credit, and enabled him to substantially complete the performance of his contract. This was no slight or immaterial consideration, and it cannot be whistled down the wind, or concealed from view, by harping on the fact that the promise of one who is unable to expend anything is as binding and forceful as the agreement of one who is able and willing to perform his contract. There was another material consideration secured to the city under this agreement. That was the use, during the term of the grant, of all the conduits which the grantees should lay, and of all the poles which they should erect to carry the telegraph and telephone wires of the city, and, at the end of the term, the pipe line from Lake Moraine to Manitou. Moreover, the statute of Colorado, which has been quoted, does not, in our opinion, avoid or render inoperative that portion of the ordinance and contract which secured to the city the use of the electric lights and power, and that for several reasons. In the first place, the ordinance does not purport to grant to Jackson, his associates or assigns, the authority to erect electric light works, and therefore a vote of the taxpayers was not required by the statute to authorize its passage. The authority granted by the ordinance is limited to the construction of proper plants for generating electricity by water power, and of conduits, wires, and poles for the transmission of the electric fluid. In the second place,

the statute has no application to electric light plants erected by private parties for their own business purposes. It applies only to waterworks, gas works, and electric light works purchased or erected by cities, or built for cities, under contracts with them, by other parties. It was not—it could not have been—the intention of the legislature to require the approving vote of the majority of the taxpayers of a city every time its council issued a license to a corporation, partnership, or person to erect or install a gas plant or an electric light plant upon its premises for domestic or business uses. Again, there is nothing in the ordinance which requires the grantees to erect or maintain any electric light plant whatever. It does impose upon them the duty, and they have assumed the obligation, to furnish to the city electric lights and electric power; but the contract leaves it optional with them to produce and supply this light and power themselves, or to persuade others to do so for them. The result is that the grant contained in the ordinance of September 8, 1898, was made for well-recognized public purposes, for the enlargement of the water system and the induction of the electric lighting system of the city of Colorado Springs, and it secured to the city ample consideration to sustain it. Under the statutes of Colorado this city was empowered to regulate the use of its streets, to provide for the lighting of the same, to pass all ordinances and to make all rules and regulations proper or necessary to exercise these powers. 2 Mills' Ann. St. § 4403, par. 66. Under these powers it had ample authority to grant the rights and privileges of constructing power houses to generate electricity in suitable places on its public grounds, of laying conduits, and of erecting poles on its streets, and of stringing wires in the conduits and on the poles to transmit the electrical power in such a way that these conduits, poles, and wires would not materially interfere with the ordinary uses of the streets and grounds by the public, and subject to the police power of the city as provided by the ordinance of September 8, 1898. 2 Dill. Mun. Corp. (3d Ed.) §§ 692, 697; Chicago Municipal Gaslight & Fuel Co. v. Town of Lake, 130 Ill. 42, 54, 22 N. E. 616; Gregsten v. City of Chicago, 145 Ill. 451, 461, 34 N. E. 426; City of St. Louis v. Western Union Tel. Co., 149 U. S. 465, 469, 13 Sup. Ct. 990, 37 L. Ed. 810; State v. Murphy, 134 Mo. 548, 561, 31 S. W. 784, 34 S. W. 51, 35 S. W. 1132, 34 L. R. A. 369.

Another position urged by counsel for the appellee is that the system of waterworks of this city, its streets, parks, and public grounds, are held by the municipality in its political or governmental, and not in its proprietary or business, capacity; that, consequently, they cannot be diverted from municipal uses, and a city council cannot make any agreement or contract relative to them which a succeeding council may not freely annul. The proposition is not novel. It has received the careful consideration of this court, and, so far as the question it presents is material to the issues in this case, it is no longer open to debate here. In Illinois Trust & Savings Bank v. City of Arkansas-City, 76 Fed. 271, 282, 22 C. C. A. 171, 181, 40 U. S. App. 257, 276, 34 L. R. A. 518, 525, this court announced its conclusion in these words:

"A city has two classes of powers,—the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other, proprietary, quasi private, conferred upon it, not for the purpose of governing its people, but for the private advantage of the inhabitants of the city and of the city itself as a legal personality. In the exercise of the powers of the former class it is governed by the rule here invoked. In their exercise it is ruling its people, and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern a private individual or corporation. Dill. Mun. Corp. (3d Ed.) § 66, and cases cited in the note; Safety Insulated Wire & Cable Co. v. City of Baltimore, 13 C. C. A. 375, 377, 378, 66 Fed. 140, 143, 144; San Francisco Gas Co. v. City of San Francisco, 9 Cal. 453, 468, 469; Com. v. City of Philadelphia, 132 Pa. St. 288, 19 Atl. 136; New Orleans Gaslight Co. v. City of New Orleans, 42 La. Ann. 188, 192, 7 South. 559, 560; Tacoma Hotel Co. v. Tacoma Light & Water Co., 3 Wash. St. 316, 325, 28 Pac. 516, 519, 14 L. R. A. 669; Wagner v. City of Rock Island, 146 Ill. 139, 154, 155, 34 N. E. 545, 548, 549, 21 L. R. A. 519; City of Vincennes v. Citizens' Gas Light Co., 132 Ind. 114, 126, 31 N. E. 573, 577, 16 L. R. A. 485; City of Indianapolis v. Indianapolis Gaslight & Coke Co., 66 Ind. 396, 403; Read v. Atlantic City, 49 N. J. Law, 558, 562, 9 Atl. 759. In contracting for waterworks to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants, but to obtain a private benefit for the city itself and its denizens. 1 Dill. Mun. Corp. § 27; City of Cincinnati v. Cameron, 33 Ohio St. 336, 367; Safety Insulated Wire & Cable Co. v. City of Baltimore, supra, and cases cited under it."

The purpose of the city in making the contract of September 8, 1898, was to enlarge its waterworks, to increase its supply of water, and to furnish itself and its inhabitants with electric light. In contracting for these purposes the city was exercising its proprietary or business powers. It is controlled by the same rules that govern a private corporation, and its contract bound its successive sets of officers.

The next proposition which counsel for the city seek to maintain is that the water system of the city and the water which flows through it are held in trust by the municipality for the suppression of fires, for the domestic use of its inhabitants, and for other customary municipal purposes; and that the city council has no power to divert them to the generation of electricity for private use, or to any such purposes. Before entering upon the consideration of this position, let us see what the power of the city is in regard to the establishment and management of its water system, and what, under the facts of this case, this contention really is. The statutes of Colorado provide that the city councils of cities in that state shall have power to manage and control all their property (2 Mills' Ann. St. § 4492); to erect waterworks on a favorable vote of their electors (2 Mills' Ann. St. § 4403, par. 67); "to construct or authorize the construction of such waterworks, without their limits, and for the purpose of maintaining and protecting the same from injury and the water from pollution, their jurisdiction shall extend over the territory occupied by such works, and all reservoirs, streams, trenches, pipes and drains, used in and

necessary for the construction, maintenance and operation of the same, and over the stream or source from which the water is taken, for five miles above the point from which it is taken; and to enact all ordinances and regulations necessary to carry the power herein conferred into effect" (Id. par. 68); to construct reservoirs in public places in the city or beyond the limits thereof for the purpose of supplying the same with water; to provide proper conducting pipes to regulate the distribution of water for irrigation and other purposes (Id. par. 72). From these provisions of the statutes it will be seen that the city council of the appellee had plenary authority to manage and control the water system and all the property of the city, and to distribute and apply its water not only to ordinary municipal uses, but to "irrigation and other purposes." These were the powers of the council in this regard. Now, what was the state of facts when the ordinance of September, 1898, was passed? The city was not then engaged in initiating and constructing a system of waterworks. That had already been done. A system extending from watersheds on Pikes Peak, 19 miles distant, and 6,000 feet above the level of the sea, had been constructed and operated for years. The city had outgrown this system, and a contract had been made three years before for the construction of a tunnel to enlarge it, and to increase its supply of water. The contractors had exhausted their means and their credit, and the tunnel still lacked an expenditure of $100,000 to complete it. This was the state of the facts. No one questions the power of the council of this city to contract for this tunnel, and to agree to pay for it in the money of the city. No one questions its power to procure electric lights, conduits, and poles to carry its telegraph and telephone wires, and to pay for them with the funds of the city. Its authority to do these things is so plain and full that it cannot be denied. Now, what did the city do, and what is the actual contention of its counsel here? The price agreed upon by the contract of 1895 for the completion of the tunnel was not compensatory. It would not pay for the work necessary to be done. The contractors could not complete it without other compensation. Thereupon the city did this: It procured the completion of the tunnel, the right to use the conduits and poles of Jackson, his associates and assigns, to carry its wires, electric lights for its public buildings, and electric power to the extent of 50 horse power, without the payment of an additional dollar of the city's money, in consideration of a permit or license which it gave to the grantees in the September ordinance of the right to use the idle water power that existed and was running to waste in its water system. Now, what is the real contention of the counsel for the city here? It is that, while the city council might lawfully have contracted for these public utilities, and have taxed its constituents, and have paid out their money to obtain them, it had no authority to procure them for and to pay for them with the idle water power that existed in the water system of the city, without the expenditure of a dollar of the money of the citizens. It is, in fact, that municipal corporations hold all that part of public utilities which they cannot apply to customary

municipal uses in trust to waste to the loss of their cestuis que trustent, and not in trust to use for their benefit. This proposition, when reduced to its last analysis, finds no support in reason or authority. It is true, as counsel for the city assert, that the water, the water system, and the other public utilities of a municipality are held by it and by its officers in trust for its citizens, and for the public; that neither the city nor its officers can renounce this trust, disable themselves from performing their public duties, or so divert or impair these utilities that they are rendered inadequate to the complete performance of the trust under which they are held. Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 51 Fed. 309, 317, 2 C. C. A. 174, 231, 10 U. S. App. 98, 175, and cases there cited. But it is equally true that municipalities and their officers have the power, and it is their duty, to apply the surplus power and use of all public utilties under their control for the benefit of their cities and citizens, provided, always, that such application does not materially impair the usefulness of these facilities for the purposes for which they were primarily created. Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 51 Fed. 309, 321, 2 C. C. A. 174, 234, 10 U. S. App. 98, 180; City of St. Louis v. The Maggie P. (C. C.) 25 Fed. 202; State v. City of Eau Claire, 40 Wis. 533; Green Bay & M. Canal Co. v. Kaukauna Water-Power Co., 70 Wis. 635, 35 N. W. 529, 36 N. W. 828; Bell v. City of Platteville, 71 Wis. 139, 36 N. W. 831; French v. Inhabitants of Quincy, 3 Allen, 9; Worden v. City of New Bedford, 131 Mass. 23; Camden v. Camden Village Corp., 77 Me. 530, 537, 1 Atl. 689; Brown v. Winnisimmet Co., 11 Allen, 326, 334; Midland Ry. Co. v. Great Western Ry. Co., 8 Ch. App. 841, 851; Simpson v. Hotel Co., 8 H. L. Cas. 712; Hendee v. Pinkerton, 96 Mass. 381, 386. This question was presented to this court and exhaustively argued by able counsel in Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., supra. In that case the Union Pacific Railway Company had leased to another company for 999 years the joint use of its bridge across the Missouri river and of its terminal facilities at Omaha, together with about seven miles of its track, and it was contended that this lease was beyond the powers of the corporation, and void, because it was a diversion of the use of its railroad facilities from the public purposes for which the railroad corporation held them. The contract was, however, sustained, because it appeared that the use leased was a surplus use remaining after the Union Pacific Railway Company had retained for itself sufficient facilities to perform all its public functions and to discharge all its public duties. This court held, after careful consideration, and its decision was subsequently affirmed by the supreme court (Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265), that, if a corporation necessarily acquires for the conduct of its corporate business facilities whose entire capacity is not needed for its corporate use, it is not required to hold them in idleness; but it has the power, and it is its duty, alike to its stockholders and the public, to lease or otherwise apply the surplus use for their benefit. In State v. City of Eau Claire, 40 Wis. 533, and Green

Bay & M. Canal Co. v. Kaukauna Water-Power Co., 70 Wis. 635, 35 N. W. 529, 36 N. W. 828, the supreme court of Wisconsin held that, where a city had legislative authority to erect a dam for the purpose of waterworks for the city, it might lawfully lease for private purposes any excess of water not required for its waterworks. This is a just and reasonable rule. It is a rule inconsistent with no principle of law or of equity, and in accord with that common sense and common business practice which recognize as a public good the growth of two blades of grass where but one grew before, and the conversion of waste to use. The case in hand falls far within the rule. By the contract of September, 1898, the city renounced no trust that had been imposed upon it. It disabled itself from the discharge of no duty. It in no way impaired the usefulness of the water or of the water system of the city for the public purposes for which it was constructed and maintained. On the other hand, that contract expressly provided that the water diverted by the grantees under it should be returned to the water system of the city unimpaired, without pollution or diminution of its flow, and that the grantees should do nothing under it which should interfere in any way with the successful operation of the waterworks of the city. Every use of those waterworks and of the water requisite to the discharge of the trust under which they were held for the usual municipal purposes was retained by the city unimpaired, while the idle power therein which was running to waste was wisely utilized, not for private use, but for the public purpose of enlarging the waterworks of the city, of increasing its supply of water, of procuring conduits and poles to carry its wires, and of obtaining electric light and power for its public buildings and its streets. The ordinance and the contract, therefore, were not void on the ground that the water system and the water were held by the city in trust to extinguish fires, to distribute to its inhabitants for domestic uses, and for other municipal purposes, and on the ground that the municipality had no power to divert them to generate electricity for private use, because every use of the water and of the waterworks for which they were held in trust was expressly retained by the city unimpaired, because the grant in the ordinance was made for public purposes, and not for private use, and because that grant wisely utilized an idle water power for the benefit of the city and its inhabitants, without impairing the uses for which the water system was constructed and maintained.

Another argument of counsel for the appellee was that the portion of the ordinance which grants rights and privileges outside the limits of the city is void, because the city council has no power over that portion of the water system which is not specially given by legislative enactment. But, if the premise of this argument is sound, the conclusion does not follow, because the statutes which we have already quoted give ample power to the city council to grant the rights and privileges in that portion of the waterworks and of the water beyond the limits of the city which were conveyed by the ordinance. 2 Mills' Ann. St. §§ 4492, 4403, par. 68.

This concludes the discussion of all the arguments presented by counsel for the city in support of their contention that the contract of September 8, 1898, was beyond the powers of the city and of its council. For the reasons which have been stated, these arguments have not proved convincing or persuasive. In the answer of the city some other reasons were stated for the contention which the city here maintains, but they are either unfounded in law or not established by the evidence, and, as counsel for the city have deemed them unworthy of argument, they will not be discussed. Our conclusion is that the city council of Colorado Springs had the power to pass the ordinance and to make the contract of September, 1898, and that its subsequent attempt to repeal the former and to annul the latter, after the rights and privileges granted had become vested, was a violation of the constitution of the United States, and ineffectual for any purpose.

Finally, it is insisted that, if the contract was valid, the decree was right, because all rights and privileges under the ordinance were forfeited by the failure of Jackson to complete the tunnel within the time limited by the agreement. There is a provision in the contract that all the rights and privileges under it shall be forfeited by a failure to complete the tunnel by December 8, 1899. But another provision of the agreement is that if, for any cause for which the city is responsible, the work is materially delayed, then the time for the completion of the work shall be extended for a time equal to the aggregate length of the time of such stoppage or delays. Jackson drove the tunnel through the mountain within the time prescribed for its completion, and prosecuted his work vigorously and in good faith, but he did not reduce the tunnel to grade, or line it or finish it according to the specifications, within the time named in the contract. On the other hand, the city had repeatedly refused to pay him moneys that were due him for work which he performed in 1898, until he enforced payment by judgments of the courts. The city passed the repealing ordinance of February, 1899, answered this bill that its grant of 1898 was void, and so earnestly insisted upon its contention that it persuaded the court below to so hold. There is evidence that these wrongful acts of the city caused delay in Jackson's work, and that, in their absence, he would have completed the tunnel in time. This is the claim of the appellant. In our view, it is unnecessary to determine in this case whether or not that claim is well founded. This is not an action at law to enforce the forfeiture of this contract. This is a suit in equity to avoid the unlawful act of the city in attempting to annul its agreement. The claim of the city that the rights granted by it have been forfeited by delay in the performance of the agreement is presented by a supplemental answer. Whatever else may be the fact, this is certainly true: the great burden of the work of driving the tunnel had been borne, and that work had been substantially done, when the limit of the time for its completion was reached. The substantial benefits of the contract, the essential consideration which induced the city to make it, either has accrued to it, or surely will accrue to it. The tunnel has been driven. The city now asks

this court of equity to relieve it of the burdens of this contract while it retains this great and substantial benefit. That prayer does not appeal with much force to the conscience of a chancellor, and it cannot be granted here. Neither Jackson nor his assignee, the appellant, has committed any wrong, or violated any rule of law or of equity, in their dealings, and the case presents no equitable ground for depriving them of the rights and privileges which were granted to them under the contract, and which they have fairly earned by the substantial completion of the great work they undertook. "A court of equity can act only on the conscience of a party. If he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction." Boone v. Chiles, 10 Pet. 177, 210, 9 L. Ed. 388; Illinois Trust & Savings Bank v. City of Arkansas City, 76 Fed. 271, 293; 22 C. C. A. 171, 193, 40 U. S. App. 257, 294, 34 L. R. A. 518; U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 960, 15 C. C. A. 96, 108, 32 U. S. App. 272, 291; U. S. v. Northern Pac. R. Co., 95 Fed. 864, 880, 37 C. C. A. 290, 306.

The decree below is reversed, and the case is remanded to the circuit court, with instructions to enter a decree for the appellant for the relief prayed in its bill.