For the sake of brevity, a detailed recital of the pleadings and the documentary and other evidence submitted in the cause, and the many points made in the very able arguments of counsel will be unnecessary. Only such references thereto will be made as may serve to indicate the grounds of the views herein expressed.
The contention of the plaintiff is, in brief, that the contract in question which grants the C., G. & P. R. R. Co. a permissive right for a term of years to operate their railway over and through the water works property near California, Ohio, is void, as being beyond the power of the board of water works commissioners to make. But among the defenses pleaded is one that lies at the threshhold of the inquiry, being in the nature of a plea in abatement, namely, that the action is not brought, as it purports, in the interest of the city of Cincinnati or its tax-payers, but in the real behalf and interest of a rival and competing railroad company also operating a line of railway over and through the water works property under control of said waterworks commission, to a common completing point at Coney Island lying beyond, for the purpose of defeat•ing and embarrassing the C., G. & P. R. R. Co in respect of its rights acquired under said contract.
This defense raises a legal question as to the right of a taxpayer to use the privilege given him by the statute in behalf of the public for other and private interests.
*491 The question has a double aspect, arising first under the code provision requiring that suits shall be brought in the name of the real party in interest, and second, under the well known rule that equity will not permit its jurisdiction to be used as a mere cover for a collateral attack.
In this ease, the evidence shows (and the plaintiff admits) that he appeared before the water works commissioners as the . paid attorney and in the interest of the then Cincinnati & Eastern Railway Company, in December, 1901, to oppose the making of the contract in question — -for which service he was paid one hundred dollars ($100) by said company.
It is next shown that on July 1, 1902, a petition in quo w.arranto was filed in the state Supreme Court against the C., G. & P. R. R. Co. — said petition being signed by the attorney-general and by the general counsel for the then Cincinnati & Eastern Railway Co. — setting forth the above mentioned contract of December 10, 1901 (the same as here in question), and claiming ouster, because of the invalidity of said contract upon substantially the same grounds as urged in the suit at bar; and that upon the hearing of said cause in the Supreme Court the argument was made, and brief prepared and submitted by said attorney of the Cincinnati & Eastern Railway Company and an associate, as principal counsel.
It next appears that in another similar proceeding in the Supreme Court filed on July 25, 1902, against the Cincinnati & Eastern Railway Company, said company defended by its same attorney.
In the first of these cases, counsel for the competing companies appeared for their respective clients, urging substantially the same claims and defenses as are urged here, namely, the want of power in the water works commission to grant such rights; but the Supreme Court held that quo warranto was not the proper proceeding in which to raise the question of validity of the contracts in question. These facts are chiefly material as showing a status of active controversy between the two companies in relation to the subject-matter of the present suit.
This suit was filed May 1, 1903, and thé plaintiff testifies that some weeks before that time his attention was called to the *492 matters involved in it, by the counsel for the Cincinnati & Eastern Railway Company who showed him the judgment and papers in the Supreme Court proceedings, and wanted him to look into the matter with a view to his bringing the present suit, as they wanted him to test the question. Later, something was said about compensation, and after filing the suit, he was paid by the Cincinnati & Eastern Railway Company one hundred dollars ($100) and they agreed to pay him one hundred dollars ($100) more when the suit should be determined in this court. These payments and agreements are further established by the testimony of the president of the company.
Plaintiff further testifies as follows:
“They [meaning the C. & E. R. R. Co.] and your road [meaning the C., G. & P. R. R.] are rival railroads. They are interested in cutting you off from .getting to Coney Island. ’ ’
Plaintiff also admits that in bringing this suit ostensibly for other tax-payers, he had in mind only the attorneys of the Cincinnati & Eastern Railway Company.
The state of fact thus disclosed brings the question of plaintiff’s right to prosecute this suit sharply into consideration in a forum where equity and good conscience on the part of litigants are the mainsprings of its action.
Before statutes of this nature were enacted, a tax-payer had no right to invoke a remedy of this nature, except where his own property rights were put in jeopardy by the act in question, against a municipality (Beach Inj., par. 13). The power to do so was placed in his hands as a privilege to be exercised in a public capacity and for the public benefit. The language of our statute is :
“It shall be lawful for such tax-payer to institute such suit for such purpose in his own name on behalf of the corporation,” etc., and if the court is satisfied that the case is well founded in law or that the tax-payer had good cause to believe so, he is allowed his costs and reasonable counsel fees.
It certainly should not be contended that, in considering such a case from the standpoint of equity and justice, a court of equity should ighore the time-honored and settled principles that constitute the warp and woof of its jurisdiction, and shut *493 its eyes to the obvious evils that would flow from permitting — in a case where the fact is plainly proved and openly admitted — a party to farm out, for a money consideration to private interests and for private benefit solely, the high privilege conferred by the statute.
Yet it is so contended in this ease, and it is claimed that the Supreme Court has so decided. But the case referred to (Traction Co. v. Parrish, 67 O. St., 181, 194), does nothing of the sort, but merely reiterates a familiar doctrine, namely, that in prosecuting a private right cognizable in a court of competent jurisdiction, the motives of a party are immaterial.
The true principle involved here is well set forth by the Court of Appeals of South Carolina, in an early case, as follows:
“The redress of private wrongs, and the suppression and punishment of crimes and misdemeanors, as a means of promoting the happiness of mankind, are the leading objects of the government and laws of every well regulated society. The pursuit of right, whether public or private, can never be an offense where justice alone is the end in view; but every perversion of the machinery of law to other purposes by coupling it with improper objects, is reprehensible. * * *
“He who brings a public offender to justice does well; but he who uses a public prosecution as a means of gratifying a passion for mischief, or for the sake of filthy lucre, is an offender of no ordinary magnitude” (State v. Chitty, 1 Bailey, 379, 401).
These general views have been recognized and applied in cases like that at bar in this and other jurisdictions.
Thus, in Gallagher v. Johnson, 31 W. L. B., 24, in the court of common pleas of this county, a tax-payer’s suit based upon the statute in question was dismissed upon the ground that it appeared at the trial to have been brought at the request of a person or corporation whose interests were inimical to the municipal corporation, and that the tax-payer had been indemnified by him or it for the fees and charges of the suit. The very able opinion of Judge Wilson treats the subject at length, citing 3 Cir. Ct. Repts., 201; 5 Cir. Ct. Rep., 609; same p. 124; 7 Cir. Ct. Rep., 84; and distinguishing Brookman v. City of Creston, *494 79 Iowa, 588, and Mazet v. Pittsburg, 137 Penn. St., 548. His conclusion is thus stated:
“Now certainly, if the right to bring this action is a privilege conferred upon the plaintiff for the purpose of protecting the corporation, if the plaintiffs have commenced the action, not for the purpose of protecting the corporation, but for the purpose of advancing the rights of private individuals under the guise of protecting the corporation, it is an abuse of the privilege conferred by the sttatute, and plaintiffs are not entitled to any standing in this court. ’ ’
In Mazet v. Pittsburg, the plaintiff was shown to be a property-holder on the line of the paving improvement and directly affected by it. The Supreme Court of Pennsylvania on this point said :
“If it appeared that plaintiff was a mere volunteer without direct personal interest in the controversy, or that he had bought his way into it since the acts complained of occurred, his position would be different * * * but he avers that he is a property owner on the street, and as such liable to be assessed for the paving, * * * in short, has a direct pecuniary interest in the controversy.
“We agree that the question of plaintiff’s standing should have been raised by a plea in abatement; but * * * there is nothing in the facts-of the case to sustain it.”
The decision of Judge Wilson is sustained and approved by the Circuit Court in Brown v. Toledo, 10 C. C., 642 (645) as:
“A case in which there was a very full and very fair discussion of the question, and which seems to us a very correct statement of the law” * * * and the court further say: “We are pretty strongly of the opinion that if that fact had appeared on the trial here that action [dismissal] would have been had in this court.”
Judge Pugh of the Franklin Common Pleas in Fergus v. The City of Columbus, 6 N. P., 82, in dismissing a tax-payer’s suit upon other grounds, cited with approval the same principle, saying:
“When the bone of contention is a contract awarded by the municipal corporation to one of several competitors, a suit prosecuted nominally by a tax-payer, but in reality to help *495 a disappointed competitor, would be a gross abuse of the rights conferred by the statute, and courts will refuse to exercise the jurisdiction when that fact is shown.”
In Hull v. Ely, 2 Abbott’s New Cases, 440, the New York Supreme Court, by Yan Brunt, J., dismissed a tax-payer’s suit brought upon a similar statute of New York. He says:
“It is claimed on the part of the plaintiff that he, being a tax-payer, the act gives him the absolute right to maintain the action. The provision of the act is that actions may be prosecuted by a tax-payer to prevent waste or injury to the property of the: corporation; hence it is apparent from the language of the statute that if such is not the object of the action * * * no power is conferred upon the court to entertain the suit. The evident intent of the act was to give a tax-payer a standing in court for the protection of the interests of tax-payers * * * but not for the furtherance of the schemes of parties who have no right * * * to claim the protection of the court.
“It is apparent from the circumstances of this case that the plaintiff has not commenced this action to protect his interests as a tax-payer, but the real parties in interest are the persons now using the ferry franchises, and consequently he has no right to call upon the court for this exercise of its equitable powers. ’ ’
In this same connection may be considered a further objection made by the defendants touching the right of the plaintiff to maintain this suit, namely, that the corporation counsel did not fail to bring the action when requested by plaintiff, as contemplated by the statute.
The facts in this regard are that, on April 27, the plaintiff mailed his letter requesting that suit be brought to restrain the city from permitting the C. G. & P. R. R. Co. from operating its railroad through the water works property, “except as may be necessary for the proper and lawful conduct and operation of said water works during its construction, and thereafter.”
The corporation counsel responded next day that he desired to examine records of the Supreme Court in certain cases pending, in which the question was involved; and on May 1, in response to requests by telephone for an immediate answer, writes that the records had been received on April 30, and that *496 owing to Ms preoccupation in duties involved in the pending changes to be made in city affairs by the-new code about to go into effect he had not sufficient time to make the necessary examination, and declined to bring the suit “to-day or tomorrow,” or until he had “sufficient time to determine whether or not such suit should be brought.”
Plaintiff thereupon filed his suit on that same day; May 1.
Plaintiff in argument seeks to justify his action by the fact that the new code, adopted by the General Assembly in 1902, and which was to take effect on May é, 1903, contained a provision barring suits of this nature after one year from date of the contract. He claims that in consequence an exigency existed which made the delay of the corporation counsel constructively a failure to act, because not to so act was, in effect, to deprive him of his right.
The argument admits that there was no failure in fact. It is not claimed that the delay for purposes of investigation was unreasonable, and certainly the importance of the question in view of the pendency of proceedings in the Supreme Court, would negative such claim if made especially at a time when the impending change in municipal government threw upon the corporation counsel an unusual burden of pressing duties.
The time for taking effect of the new code had been known to plaintiff, as to all others interested, for a long time; and he admits that he had the matter of this suit under consideration some months before it was filed. There was no exigency inhering in the subject-matter of the suit. The status complained of had existed ever since he himself opposed the contract in 1901. The only exigency that existed — if so it may be called — was by reason of the neglect of the plaintiff in delaying his request. His argument in justification therefor, lacks both propriety and cogency, for his experience as a lawyer surely must have taught him that a reasonable time must be allowed a public officer, under such circumstances, to examine into the probable merits of such a suit; and that the “failure” contemplated by the statute can be predicated only upon a refusal to act or an actual failure to do so beyond *497 a" reasonable time required for investigation — neither of- which contingencies is shown in this ease.
In a court of equity, diligence in asserting a right is always commended, and one who is shown to have slept upon his rights is often remitted to continued somnolence — out of court!
(2.) The cause has been fully argued on its merits; and as it is of such public importance, and a dismissal of the action upon grounds that do not involve decision upon the merits might result in prolonged delays in litigation before reaching a final determination, the entire contention will be disposed of, so far as it may be done in this court, by consideration of the merits of the cause notwithstanding the objections herein-before discussed.
The plaintiff in his final brief summarizes his contention in these words:
“Of course the city’s interests are to be considered. That is what this suit is for: — to determine whether any of its property can be turned over to the absolute control of a moneymaking corporation for thirty-five (35) years, to do a commercial and general railroad business. Such purpose is not germane to a water works system. ’ ’
The petition alleges in substance: (1). That the Cincinnati, Georgetown & Portsmouth Railroad Company is operating a line of railway from Carrel street, Cincinnati, through the water works property to a point beyond, doing a common carrier business; and that said line was constructed through' said water works grounds at the joint expense of the water works commissioners and the railroad company. (2). That the construction of said railway and its operation as a common carrier are by authority of said commissioners, but without authority of the board of legislation of the city, although said board of legislation is fully advised of the facts, and has taken no steps to prevent the diversion of the grounds and the operation of said railway. (3). That the railway company, unless enjoined, will continue so to operate for thirty (30) years; wherefore the court is asked to adjudge the said operation to be in contravention of the law and an abuse of the corporate powers of the city; and to enjoin the *498 same and direct the removal of said track, “except so far as. may be necessary for the necessary and lawful conduct and operation of the road through the said water works during construction, and thereafter.”
It will be noted that there is here no claim that the tax-payer nor the public are in any manner injured, either by increase of taxation or otherwise; nor that the permission or authority given the railroad company is in any way injurious to the interests of the city or the public; nor, indeed, that it is not beneficial to those interests. The ordinary grounds of injury of a tangible nature, the prevention of which is the predicate of injunction proceedings, are wholly wanting. This action is. based upon the bare statutory right without aid from extrinsic facts.
And it will be further noted that the sole ground of illegality claimed — excepting an allegation that the trackway over the water works property was constructed at joint private and public expense — is that the board of legislation of the city has-not given its consent to the authority derived by the company from the commissioners.
The * so-called “commissioners of water works,” styled also “trustees,” in the act, were appointed by the governor of Ohio under the provisions of and with powers enumerated in Sections 2435-1 to 2435-18 of the Revised Statutes, for the general purpose of providing a new and enlarged plant and system for the water .supply of Cincinnati. To defray the costs and expenses of the work they were authorized to borrow six million five hundred thousand dollars ($6,500,000), and subsequently (95 O. L., 821) two million dollars ($2,000,000) additional, on behalf of the city, and issue bonds therefor signed by the president of said commissioners of water works and the city auditor.
The manifest purpose of the act, as evidenced by its terms, is to vest in said commissioners powers to carry out a .vast undertaking. They were to adopt plans and specifications providing for construction within or without the city limits, including a long list of enumerated things, and in addition “such other fixtures, appliances or facilities, as in their opinion are necessary.” They are given full power to contract, and are re *499 lieved from the operation of special limiting statutes governing the city authorities in its contracting power. The full power of eminent domain of the city is vested in the comiñissioners, relieved of the necessity of concurrent action of any other officer or board; and they are authorized to acquire, by purchase or condemnation, any real and personal property and franchises necessary for the work. The only expressed limitation relates to the mode of making certain contracts, taking vouchers for money, payments, etc. It is also provided that upon final completion of the work, it shall be surrendered to the city board having charge of the water supply.
In considering the character of the powers granted under this act, I can but repeat here what I said in The City of Cincinnati v. The Trustees of the Southern R. R. et al, in the general term opinion, subsequently approved, inferentially at least, by the Supreme Court, viz:
“As to the power of the trustees to be exercised under the act in question [referring there to an act giving certain authority to the Southern Railway Trustees] we can entertain no doubt. Considering the important character of the trust, it is not to be supposed that it was ever intended by the Legislature to minimize and confine the powers of the trustees in the premises, but • rather to amplify them to the full measure of the necessity; and, certainly, if it depended upon questions of mere statutory construction, we should feel constrained to apply the most liberal rules recognized by the practice of courts in such cases. ’ ’
Nor is it to be supposed that in dealing with such a subject as that in question, the Legislature were unaware that they were creating proprietary powers of a quasi-private nature for the private advantage of the inhabitants of the city of Cincinnati as a legal personality, and not powers of that other class relating more directly to purely governmental functions. In respect of the former powers, authorities charged with their exercise are trustees in fact, and governed by many of the considerations applicable to individuals under the responsibilities and duties of the trust management (City of Cincinnati v. Cameron, 33 O. St., 336).
The distinction is a vital one in this case; and a consideration of the magnitude and complex character of the undertak *500 ing and a study of the text of the act creating the commission, —which enumerates rather than defines the powers granted:— suggests the familiar doctrine of “implied powers,” as applicable ex necessitate, and as fairly within the scope and intent of the act.
We pass now to a consideration of the contract in question in the light of the facts.
The water works commission, controlled by physical conditions of the territory in and contiguous to Cincinnati, acquired a tract of land several miles above the city, fronting on the Ohio river, and extending thence back to and upon the hills that bound the river valley, thereby — it may be remarked in passing — controlling the Ohio side of the great natural highway of the valley of the Ohio lying between the hills and the river, and connecting Cincinnati with the up-river cities and towns.
Obviously one of the first problems of the situation that confronted the commissioners was that of transportation. The first and most vital of the “appliances” and “facilities” required at the outset of the work was a railway connection with the trunk-lines entering Cincinnati, whereby carloads of heavy machinery and other structures, cast iron pipes of large size, material and appliances of every description, required in the work by the commissioners or contractors, could be brought from mine, factory or quarry, situated anywhere in the United States, and.delivered upon the grounds without breaking bulk. Without such facilities, and forced to depend upon the river or the only other then existing highway — a turnpike road — it would have been impossible to carry out the intended work within any practicable limit of cost.
The Cincinnati, Georgetown & Portsmouth Railroad — a narrow gauge railway of limited capacity — was the only railway available. It connected with the Pennsylvania system, and through it with the other leading railways of the country at Carrel street about three miles away, and touched the water works property at the northwest corner. The commissioners very properly, and in order — to borrow the phrase of the Supreme Court — '“to get everything ready to proceed to the construction,” built a suitable railway track upon their property *501 (in order that the whole ownership and control thereof might be in the public as our law requires), and extended it by a necessary viaduct to the boundary line of the property at a point nearest the Cincinnati, Georgetown & Portsmouth Railway. This was done upon the understanding embodied in the contract of August 5, 1898, under which the railway company pro-' eeeded to rebuild its track and appurtenances from a connection with said water works viaduct to Carrel street, in order to bring in standard gauge cars from other railways.
Unquestionably this arrangement was a most desirable one to the city, for not only was the contract in its terms in every respect favorable for the city, but in collateral aspects was beneficial in a far reaching degree as an important factor in every contract for supplies' of all kinds. Indeed it was vital to the successful accomplishment of the entire work, and it must remain an important factor in the 'future maintenance of the system.
But a mere spur-extension into the water works grounds was soon found to answer but partially the requirements of the situation. Officers, employes, contractors, workmen and the general public interested in the work, required more frequent and regular communication with the city than the railway company was justified in providing, upon the basis of the water works’ business alone.
The railway company therefore extended its line southeastwardly from the water works property to California and Coney Island, and the commissioners, by a contract dated December 10, 1901, leased to them non-exclusively for a term of years the surplus use of the trackway through its property for general railroad purposes, and authorized them to plant poles and string wires for electrical propulsion, thereby enabling the company to run cars at frequent intervals and avoid smoke and cinders that might be detrimental to the water supply.
Of this contract — which is the one in dispute in this case— it may be said (as also of the first contract) that so far from being in any way detrimental to the city’s interest it is in all respects highly beneficial..- It will suffice here, without setting forth the contracts in full, to point out the salient features in connection with the objections urged.
*502 Under the first contract, the commissioners were to bnild a railway of standard and narrow gauge from their boundry line nearest the Cincinnati, Georgetown & Portsmouth R. R. across the water works lands near the village of California, lying just beyond, and to keep in repair all embankments, bridges, trestles and piers of the railway so constructed. The Cincinnati, Georgetown & Portsmouth R. R. Co. were to construct their railway from Carrel street station to connect with the railway thus built by the commissioners and were to operate said railway from Carrel street to and upon the water works land and switch ears from Carrel street under specified and very favorable rates, or a proportionate part of any through rate made direct to the water works terminus, and to pay on each car loaded in full or in part thus hauled, a certain pried during the construction of the water works.
The second contract recites the first one, and contains a declaration of the commissioners that the rights thereby provided for and as revised and modified by the second, are necessary for the construction and future maintenance of the works; grants permission and authority to the C., G. & P. R. R. Co. to operate with the necessary equipment, the railway built by the commissioners over the water works property, to the village of California, and to construct certain portions of the track upon the water works lands which the commissioners had failed to construct as agreed, and maintain a passenger station on the grounds. It is provided that all track thus constructed on the grounds shall belong to the city, and that all track shall be maintained by the company. After completion of the water works, electricity only is to be used as a motive power in the operation of the railway. Then follow minor provisions relating to protection of the city’s interests in various particulars, as conditions precedent to the continued operation of the railroad; and reservation of a right to permit the joint use of the tracks by any other railway. It limits the term of the grant or lease to thirty-five (35) years; and provides for a car license during the construction of the water works and a flat rental of five hundred dollars ($500) per year thereafter in lieu of car licenses, with a reservation also of a right to terminate the *503 lease at any time for failure of the railway company to comply with any of the conditions of the lease. There is also a restriction upon transfer of rights; an extension of switching rates as provided in the first contract, during the continuance of the lease; and requires a bond of fifteen thousand dollars ($15,000) for faithful performance by the company.
By this second contract, in addition to the mere delivery of freight cars upon the water works property, there was established a direct, speedy and frequent communication with the •city — for the Cincinnati, Georgetown & Portsmouth railway .also connects at Carrel street with the street car lines— by which the officers, workmen and the general public could reach the works at will and at small expense. In addition to this, baggage, express matter and mails are promptly interchanged with equal facility. To say that these things are not germane to a water works system, is to ignore the vital conditions incident to every large enterprise carried on by human labor.
The advantages accruing to the city in respect of the multitude of persons necessarily employed in the work, in cheapening and rendering possible the securing of labor, were second •only to those relating to the transportation of heavy freights from a distance; and the objections grounded on the want of connection between water works purposes and the operation ■of the railroad as a common carrier, fall of their own weight:
But it is said further that the lease-contract is “ultra vires” .and “invalid,” because, in the construction of the railway through the water works property, there was a joint enterprise .and an unlawful mingling of public and private funds; .and further, in support of this contention, that it is “no part •of a municipal function to provide railroad facilities,”, or “to turn over city property to the sole control of a railroad company and furnish a right of way over city grounds, and still less, to expend public funds thereon.”
But this objection rests upon loose thinking, and a failure to •observe the clear distinction hereinbefore pointed out between' purely municipal or governmental and proprietary functions. It is quite clear from the terms of the contract in question that *504 the ownership and control of the city property is carefully reserved to the public. What has been done, was and is simply a leasing of the “surplus use” which does not in any way involve the city in any joint enterprise or in partnership relations of any kind whatever. It is also quite clear that the building of the railway over the grounds by the commissioners was necessary for reasons already pointed out.
The objection is based upon a manifest misstatement of the facts to support a misconception of the law, for it is obvious upon the actual facts that if the law were, as embodied in the objection, every leasing of municipal property, the use of which is not needed, would be equally a violation of the law. The distinction is very clearly pointed out in the case of this plaintiff against the city, based upon the water works law in question, and cited here in support of his contention (Alter v. City and Ampt v. City, 56 O. St., 47 [see p. 64]).
In connection with the last mentioned objection it is also urged that the contract is invalid because the commissioners being a mere.“building committee” have no authority to make a contract continuing beyond the period required for construction. But this rests upon no better foundation.
In the exercise of purely governmental functions the authorities charged with- them are bound to transmit the powers entrusted to them unimpaired to their successors; but in the exercise of proprietary functions, they are controlled by no such rule, because they act and contract for the private benefit of the municipality and its inhabitants, and may exercise their business judgment as private trustees might do (1 Dill. Munic. Corp. [3d Ed.], par. 66 and par. 27; Cinti. v. Cameron, 33 O. St., 336, 367; Safety Cable Co. v. City of Balt., 13 [U. S.] C. C. App., 375, 377).
It is clear that if facilities for transportation afforded by a railway are within the purview of the powers vested in the commission — and of this I think can be no reasonable doubt in the present case — then, obviously, these facilities could be paid for out of the funds provided for the general purposes of the work. If no such facilities had existed, the necessity might possibly have justified the construction of a special line of *505 railway at a very large expense, for it will be noted that the power to acquire franchises is expressly given in the act.
But, instead of thus expending the public money, except for the trackage upon its own grounds, which was manifestly proper, the commissioners, very wisely as appears, negotiated upon the basis of a mere permit or license, authorizing the use for a limited term of the idle increment of the trackage, for very great and continuing benefits to the city and the public in respect of the water works, present and future, incidentally providing for the maintenance of the trackage by the lessee and a source of revenue therefrom to the city. Had the same thing been done by a board of directors of a private corporation as trustees for the stockholders, certainly praise and not censure would be freely accorded.
The language of the opinion in the ease of Pike’s Peak Co. v. Colorado Springs, 105 Fed., 1, exactly applies. The court there said:
“Now what is the real contention of counsel here. It is that while the city council [water works commissioners] might lawfully have contracted for these public utilities, and have taxed its constituents, and have paid out their money to obtain them, it had no power to obtain them and pay for them out of the idle water power” [surplus use of trackway] “that existed in the water system of the city without the expenditude of a dollar of that money of the citizens. It is, in fact, that municipalities hold all that part of public utilities which they can not apply to customary municipal uses in trust to waste, to the loss of their cestuis que trustent, and not to their benefit. This proposition finds no support in reason or authority. # * *
“Municipalities and their officers have the power, and it is their duty to apply the power and use of all public utilities under their control for the benefit of their cities and citizens, provided always, that - such application does not materially impair those facilities for the purposes for which they were primarily created” (Union Pacific Ry. v. Chic., R. 1. & P. Ry., 51 Fed., 309 [affirmed by the U. S. Supreme Ct. in 163 U. S., 321, 564]; City of St. Louis v. The Maggie P., 25 Fed., 202; State v. City of Eauclaire, 40 Wisc., 533; see also 70 Wisc., 635; 71 Wisc., 139; 3 Allen, 9; 131 Mass., 23; 77 Maine, 530-7; 96 Mass., 381-6; Ch. App., 841-51; 8 H. L. Cas., 712).
If the power to contract, in the independent relation of trustees, exists, the only question open to discussion concerning a *506 given contract would be wheteber, as shown by its terms and scope and the surrounding circumstances, it is an abuse of the powers of the trustees. The time involved in it is simply an element, like any other, to be considered in this connection. 'Whether or not rights granted under it extend beyond the tenure of the trusteeship, is an immaterial question, unless the contract be of such a nature as that the fact of such extension points to an abuse of power. In this case the time given does not seem to me unreasonable, especially in view of the right of condemnation that existed in favor of the company, independent of the contract.
Indeed the whole question here is analogous to that involved in McCullough v. State of Maryland, 4 Wheat., 316, where the Supreme Court of the United States, in considering the power •of Congress under the Constitution to establish the U. S. bank .as an agency to facilitate the financial operations of the general government, held, Chief Justice Marshall, delivering the opinion:
“If a certain means to carry into effect any of the powers expressly given by the Constitution be an appropriate measure, not prohibited by the Constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance. ’ ’
In the statutes under consideration, the commissioners are vested with full power to provide facilities appropriate to the work, and to make contracts.
There is, in the terms of the act, no limitation as to the time for which such contracts may run. For reasons already given, transportation facilities, such as can alone be afforded by a railway operating as a general common carrier, are distinctly within the general scope of the undertaking and are facilities contemplated by the act, by fair intendment, and to contract -therefor is within the discretionary power of the commissioners. They have officially declared the necessity for the facilities secured by the contract in question; and I am clearly of opinion that, as such a contract is not prohibited in the act, and as it involves no injury, but, on the contrary is beneficial to the trust, it is' within the discretionary power vested in them under *507 their exercise of that power ‘and is not open to judicial question. For the same reasons, I am satisfied also that no action of the legislative body of the city was or is necessary to give it validity. See in support of these views, the opinions of the United States Circuit Court of Appeals in Ills. Trust & Savings Bk. v. Arkansas City, 76 Fed., 271, 282.
William M. Ampt, for plaintiff.
Charles J. Hunt, Jonas B. Frenkel and Frank F. Dinsmore, for defendants.
It was stated in argument that the grant of a right of way through the water works property to the Cincinnati & Eastern Railway was confirmed by a formal ordinance of the board of legislation of the city. This fact can have no force as an argument here because — among other reasons — while the permission of the commissioners was in that case necessary in the first instance, the character of the use may not have been so connected with the needs of the enterprise as to bring it fairly within the scope of their independent action, and hence might require the approval of the city authorities.
But we are not called upon to decide that question here.
For all reasons given, and upon full consideration, both of the merits of the ease and the special defenses urged, judgment must be rendered against the plaintiff; and, in view of the circumstances attending the bringing of this suit, the judgment must be with costs; and it is so ordered.
Judgment dismissing the action at costs of plaintiff.