WILLIAM M. AMPT v. CITY OF CINCINNATI ET AL.*

1. An action commenced by a tax-payer as such, under favor of 1536-668, Revised Statutes, to enjoin the operation of an alleged illegal contract entered into between the municipality and a railroad company, will be dismised at plaintiff's costs, when it appears from the evidence that the action is not brought in good faith for the purpose of protecting the municipality, but in the interest and at the instance of a rival and competing railroad company. The privilege conferred upon tax-payers by said statute is conferred strictly in a public capacity and for the public benefit, and not to further private schemes or interests.

2. Before a tax-payer can maintain an action under favor of Revised Statutes, 1778, to enjoin the operation of an illegal contract entered into by the municipality, the corporation counsel is entitled to a reasonable length of time after request of the tax-payer to bring the action in which to make a necessary examination into the matter brought to his attention, and a mere refusal on his part to bring suit "to-day or to-morrow," or until he had "sufficient time to determine whether or not such should be brought," is not such a failure to act as will warrant a tax-payer in commencing suit forthwith, in the absence of an exigency inherent in the subject-matter of the suit requiring immediate action. *A fortiori* when the only exigency existing, if any, was by reason of the neglect of plaintiff himself in delaying his request.

3. The petition of a tax-payer in a suit commenced under favor of Revised Statutes, 1778, which makes no claim that the tax-payer or the public are in any manner injured by the alleged illegal contract sought to be enjoined, either by increase in taxation, or otherwise, or that such contract is not beneficial to such interests, is defective, in that the ordinary grounds of injury of a tangible nature, the prevention of which is the predicate of injunction proceedings, are wholly wanting.

4. Implied power, *ex necessitate,* is conferred upon the commissioners of the Cincinnati waterworks by (Revised Statutes, 2435-1 to 2435-18), in the absence of express limitations contained therein, to contract with reference to the property and undertaking under its control, without securing the consent or concurrent action of the board of legislation or other officer or board of the municipality.

---

* Affirmed by Supreme Court, 74 O. St. ——.

5. Transportation facilities, such as can alone be afforded by a railroad company operating as a general common carrier, are distinctly within the general scope of the undertaking entrusted to the commissioners of the Cincinnati waterworks, and are contemplated by the act under which the work is being carried out; and contracts securing such facilities are, therefore, within the discretionary power of the trustees. Hence, said commissioners may, in the exercise of their power, grant to a railroad company a permissive right, for a term of years, to the surplus use" of a railroad over the property of their trust, it appearing that such arrangement is necessary and germane to the waterworks system, and also highly beneficial both to the commissioners in carrying out their work, and to the general public.

6. A lease by the Cincinnati waterworks commissioners of surplus use of property to a railroad company for a term of years, and assisting in laying a track over such property, the trustees reserving the ownership and control of the property to the public, does not involve the municipality in a joint enterprise or partnership relation with the company, especially when the arrangement between the commissioners and railroad was necessary in order to enable the former to carry out their trust.

7. In the exercise of purely governmental functions the municipal authorities charged therewith are bound to transmit the power entrusted to them to their successors unimpaired; but in the exercise of proprietary functions, such rule does not apply, because they act and contract for the private benefit of the municipality and its inhabitants, and they may, therefore, exercise their business judgment as private trustees. Hence, the commissioners of the Cincinnati waterworks, being charged with the exercise of proprietary functions of a *quasi-private* nature in carrying out the work entrusted to their charge, are therefore trustees in fact, and as such are governed by many of the considerations applicable to individuals who are under the responsibilities and duties of trust management; and it appearing that the leasing of surplus property to a railroad company is for a purpose germane to the objects of their undertaking, and not an abuse of the power conferred upon them, such transaction will be upheld, notwithstanding it is for a period extending beyond that required for completing the undertaking of the commissioners.

8. Where the power to contract in the independent relation of trustees exists, the only question that can be raised concerning a given contract is whether it is an abuse of the powers of the trustees, as shown by its terms and scope and the surrounding circumstances. The time of the contract is simply an element, like any other, to be considered in this connection,

and the fact that the rights granted extend beyond the tenure of the trusteeship is immaterial, unless the contract is of such nature that the term thereof points to an abuse of power.

W. M. Ampt, E. G. Kinkead and C. B. Ellis, for plaintiff.

The board had no power to alienate any of the land to the railway company for common carrier purposes. Especially not for the period of the grant after the completion of the work. R. S., 1678, 2407, 2435-6, 2435-13; Sections 1655, 1655b, 2212, 2408, Revised Statutes; State v. Railway, 37 Ohio St., 157, 158, 169, 176.

The board is a building commission merely. Its members are not public officers, but trustees, as the act describes them. Walker v. Cincinnati, 21 Ohio St., 14; 2435-1, 2435-6, 2435-12, 2435-14; State v. Railway, 37 Ohio St., 157.

The franchise in question involves a joint use and commingling of public property and funds with private property and violates Section 6, Article VIII, of the Constitution. Garland v. Montgomery Co. (Bd. of Rev.), 87 Ala., 223 (6 So. Rep., 402); Alter v. Cincinnati, 56 Ohio St., 47; Wyscaver v. Atkinson, 37 Ohio St., 80; Walker v. Cincinnati, 21 Ohio St., 14, 54.

The refusal of the corporation counsel to bring the suit before the going into effect of the new code, justifies the tax-payer to treat his refusal as final. Section 137 of the Municipal Code; R. S., 1774, 1777, 1778.

The competing railroad company being a tax-payer had the right to bring a suit itself under 1536-668, R. S., and so had the right to co-operate with, and aid the tax-payer who did bring this suit.

If a tax-payer in fact makes out a case under 1536-667, R. S., 1777, his motive in bringing the suit can not be made an issue. Raynolds v. Cleveland, 24 O. C. C., 215; Hamilton, G. & C. Trac. Co. v. Parish, 67 Ohio St., 181; State v. Columbus (Bd. of Ed.), 35 Ohio St., 368, 382, 383.

HOSEA, J.

1. Suit is brought by the plaintiff, in his capacity of tax-payer under the statute (Section 1778) in that behalf, to restrain operation of a contract entered into by and between the "Board of Trustees, Commissioners of Water Works," in behalf of the city of Cincinnati, on the one part, and the Cincinnati, Georgetown & Portsmouth Railroad Company, on the other, on December 10, 1901.

For the sake of brevity, a detailed recital of the pleadings, and the documentary and other evidence submitted in the cause, and the many points made in the very able arguments of counsel, being unnecessary, only such references thereto will be made as may serve to indicate the grounds of the views herein expressed.

The contention of the plaintiff is, in brief, that the contract in question which grants the Cincinnati, Georgetown & Portsmouth Railroad Company a permissive right for a term of years to operate their railway over and through the water works property near California, Ohio, is void as being beyond the power of the board of water works commissioners to make. But among the defenses pleaded is one that lies at the threshold of the inquiry, being in the nature of a plea in abatement, namely, that the action is not brought, as it purports, in the interest of the city of Cincinnati, or its tax-payers, but in the real behalf and interest of a rival and competing railroad company also operating a line of railway over and through the property under control of said water works commission, to a common competing point at Coney Island lying beyond, for the purpose of defeating and embarrassing the Cincinnati, Georgetown & Portsmouth Railroad Company in respect of its rights acquired under said contract.

This defense raises a legal question as to the right of a tax-payer to use the privilege given him by the statute in behalf of the public for other and private interests.

The question has a double aspect, arising, first, under the code provision requiring that suits shall be brought in the name of the real party in interest, and, second, under the

well-known rule that equity will not permit its jurisdiction to be used as a mere cover for a collateral attack.

In this case the evidence shows (and the plaintiff admits), that he appeared before the water works commissioners as the paid attorney and in the interest of the then Cincinnati & Eastern Railway Company, in December, 1901, to oppose the making of the contract in question, for which service he was paid $100 by said company.

It is next shown that on July 1, 1902, a petition in quo warranto was filed in the State Supreme Court against the Cincinnati, Georgetown & Portsmouth Railroad Company— said petition being signed by the attorney-general and by the general counsel for the then Cincinnati & Eastern Railway Company—setting forth the above mentioned contract of December 10, 1901 (the same as here in question), and claiming ouster, because of the invalidity of said contract, upon substantially the same grounds as are urged in the suit at bar; and that upon the hearing of said cause in the Supreme Court the argument was made, and brief prepared and submitted, by said attorney of the Cincinnati & Eastern Railway Company and an associate, as principal counsel.

It next appears that in another similar proceeding in the Supreme Court, filed on July 25, 1902, against the Cincinnati & Eastern Railway Company, said company was defended by its same attorney.

In the first of these cases, counsel for the competing companies appeared for their respective clients, urging substantially the same claims and defenses as are urged here, namely: the want of power in the water works commission to grant such rights; but the Supreme Court held that quo warranto was not the proper proceeding in which to raise the question of validity of the contracts in question. These facts are chiefly material as showing a status of active controversy between the two companies in relation to the subject-matter of the present suit.

This suit was filed May 1, 1903; and the pltintiff testifies that, some weeks before that time, his attention was called to the matters involved in it, by the counsel for the

Cincinnati & Eastern Railway Company who showed him the judgment and papers in the Supreme Court proceedings, and wanted him to look into the matter with a view to his bringing the present suit, as they wanted him to test the question. Later, something was said about compensation, and, after filing the suit, he was paid by the Cincinnati & Eastern Railway Company $100 and they agreed to pay him $100 more when the suit should be determined in this court. These payments and agreements are further established by the testimony of the president of the company. Plaintiff further testifies as follows:

"They (meaning the Cincinnati & Eastern Railway Company) and your road (meaning the Cincinnati, Georgetown & Portsmouth Railroad Company) are rival railroads. They are interested in cutting you off from getting to Coney Island."

Plaintiff also admits that in bringing this suit ostensibly for other tax-payers, he had in mind only the attorneys of the Cincinnati & Eastern Railway Company.

The state of facts thus disclosed brings the question of plaintiff's right to prosecute this suit sharply into consideration in a forum where equity and good conscience on the part of litigants are the mainsprings of its action.

Before a statute of this nature was enacted, a tax-payer had no right to invoke a remedy of this nature, except where his own property rights were put in jeopardy by the act in question, against a municipality. Beach, Injunction, Par. 13. The power to do so was placed in his hands as a privilege to be exercised in a public capacity and for the public benefit.

The language of our statute, R. S., 1778, is: "It shall be lawful for such tax-payer to institute such suit for such purpose in his own name on behalf of the corporation," etc., and if the court is satisfied that the case is well founded in law, or that the tax-payer had good cause to believe so, he is allowed costs and reasonable counsel fees; thus indicating clearly to my mind a recognition of the fact that this privilege is conferred upon a tax-payer strictly

in a public capacity, for that, in a proper case, he is to be compensated therefor, either by the public funds or as part of the costs of the suit to be assessed against the defendants.

It certainly should not be contended that, in considering such a case from the standpoint of equity and justice, a court of equity should ignore the time-honored and settled principles that constitute the warp and woof of its jurisdiction and shut its eyes to the obvious evils that would flow from permitting, in a case where the fact is plainly proven and openly admitted, a party to farm out, for a money consideration, to private interests and for private benefit solely, the high privilege conferred by the statute.

Yet it is so contended in this case; and it is claimed that the Supreme Court has so decided. But the case referred to in argument, *Hamilton, G. & C. Trac. Co.* v. *Parish,* 67 Ohio St., 181, 194, does nothing of the sort, but merely reiterates a familiar doctrine, namely, that in prosecuting a *private right* cognizable in a court of competent jurisdiction, the motives of a party are immaterial.

The true principle involved here is well set forth by the Court of Appeals of South Carolina, in an early case, as follows, and I quote from the opinion in that case:

"The redress of private wrongs, and the suppression and punishment of crimes and misdemeanors, as a means of promoting the happiness of mankind, are the leading objects of the government and laws of every well-regulated society. The pursuit of right, whether public or private, can never be an offense where justice alone is the end in view; but every perversion of the machinery of law to other purposes by coupling it with improper objects is reprehensible * * *. He who brings a public offender to justice does well; but he who uses a public prosecution as a means of gratifying a passion for mischief, or for the sake of filthy lucre, is an offender of no ordinary magnitude." *State* v. *Chitty,* 1 Bailey (S. C.), 379, 400, 401.

These general views have been recognized and applied in cases like that at bar in this and other jurisdictions.

Thus, in *Gallagher* v. *Johnson,* 1 Dec., 264 (31 Bull., 24),

in the court of common pleas of this county, a tax-payer's suit based upon the statute in question was dismissed upon the ground that it appeared at the trial to have been brought at the request of a person or corporation whose interests were inimical to the municipal corporation, and that the tax-payer had been indemnified by him or it for the fees and charges of the suit. The very able opinion of Judge Wilson treats the subject at length, citing: *Hensly* v. *Hamilton (City),* 2 Circ. Dec., 114 (3 R., 201) ; *Knorr* v. *Miller,* 3 Circ. Dec., 297 (5 R., 609) ; *Simmons* v. *Toledo,* 3 Circ. Dec., 64 (5 R., 124) ; *Sloane* v. *Railway,* 3 Circ. Dec., 674 (7 R., 84) ; and distinguishing *Brockman* v. *Creston (City),* 79 Iowa, 587, 588 (44 N. W. Rep., 822) ; and *Mazet* v. *Pittsburg,* 137 Pa. St., 548 (20 Atl. Rep., 693). Judge Wilson's conclusion is thus stated, page 265:

"Now, certainly, if the right to bring this action is a privilege conferred upon the plaintiffs for the purpose of protecting the corporation, if the plaintiffs have commenced the action, not for the purpose of protecting the corporation, but for the purpose of advancing the rights of private individuals under the guise of protecting the corporation, it is an abuse of the privileges confered by the statute, and the plaintiffs are not entitled to any standing in this court."

In *Mazet* v. *Pittsburg, supra,* the plaintiff was shown to be a property holder on the line of the paving improvement and directly affected by it. The court in that case said, page 564:

"If it appeared that the plaintiff was a mere volunteer, without direct personal interest in the controversy, or that he had bought his way into it since the acts complained of occurred, his position would be different, * * * but he avers, and they admit, that he * * * is a property owner on the street, and as such liable to be assessed for the paving, * * * in short, that he has a direct and substantial pecuniary interest in the controversy. * * *

"We also agree with the court below that the question

of plaintiff's standing in court should have been raised by a plea in the nature of a plea in abatement; but * * * there is nothing in the facts of this case to sustain it."

The decision of Judge Wilson is sustained and approved by the circuit court in *Brown* v. *Toledo* 10 O. C. C., 642 (I quote from page 116), as:

"A case arising in Cincinnati, in which there was a very full and very fair discussion of the question, and which it seems to us is a very corect statement of the law;" and the court further say, "and we are pretty strongly of the opinion that if that fact had appeared on the trial here, that that action [dismissal] would have been had in this court."

Judge Pugh, of the Franklin Common Pleas, in *Fergus* v. *Columbus* (*City*), 8 Dec., 290 (6 N. P., 82), in dismissing a tax-payer's suit upon other grounds, cites with approval the same principle, saying, page 292:

"When the bone of contention is touching a contract awarded by the municipal corporation to one of several competitors, a suit prosecuted nominally by a tax-payer, but in reality to help a disappointed competitor for the contract, would be a gross abuse of the rights conferred by the statute, and courts will refuse to exercise the jurisdiction when that fact is shown."

In *Hull* v. *Ely*, 2 Abb., N. C., 440, the New York Supreme Court, by Van Brunt, J., dismissed a tax-payer's suit brought upon a similar statute of New York. He says:

"It is claimed on the part of the plaintiff that he, being a tax-payer, the act gives him the absolute right to maintain the action. The provision of the act is, that actions must be prosecuted by a tax-payer to prevent waste or injury to the property of the corporation; hence it is apparent from the language of the statute that if such is not the object of the action * * * no power is conferred upon the court to entertain the suit. The evident intent of the act was to give a tax-payer a standing in court for the protection of the interests of tax-payers * * * but not for the further-

ance of the schemes of parties who have no right * * * to claim the protection of the court.

"It is apparent from the circumstances of this case, that the plaintiff has not commenced this action to protect his interests as a tax-payer, but the real parties in interest are the persons now using the ferry franchises and consequently he has no right to call upon the court for this exercise of its equitable powers." .

In this same connection may be considered a further objection made by the defendants touching the right of the plaintiff to maintain this suit, namely: That the corporation counsel did not fail to bring the action when requested by plaintiff, as contemplated by the statute.

The facts in this regard are, that on April 27, the plaintiff mailed his letter requesting that suit be brought to restrain the city from permitting the Cincinnati, Georgetown & Portsmouth Railroad Company to operate its railroad through the water works property, "except as may be necessary for the proper and lawful conduct and operation of said water works during its construction, and thereafter."

The corporation counsel responded next day that he desired to examine records of the Supreme Court in certain cases pending, in which the question was involved; and on May 1, in response to requests by telephone for an immediate answer, writes that the records had been received, on April 30, and that owing to his preoccupation in duties involved in the pending changes to be made in city affairs by the new code about to go into effect, he had not sufficient time to make the necessary examination, and declined to bring suit "to-day or to-morrow," or until he had "sufficient time to determine whether or not such suit should be brought." Plaintiff thereupon filed his suit on that same day, May 1.

Plaintiff in argument seeks to justify his action by the fact that the new code, adopted by the General Assembly in 1902, and which was to take effect on May 4, 1903, contained a provision barring suits of this nature after one year from date of the contract. He claims that in conse-

quence an exigency existed which made the delay of the corporation counsel constructively a failure to act, because not to so act was, in effect, to deprive him of his right.

The argument admits that there was no failure in fact. It is not claimed that the delay for purposes of investigation was unreasonable, and certainly the importance of the question in view of the pendency of proceedings in the Supreme Court, would negative such claim if made, especially at a time when the impending change in municipal government threw upon the corporation counsel an unusual burden of pressing duties.

The time for taking effect of the new code had been known to plaintiff, as to all others interested, for a long time; and he admits that he had the matter of this suit under consideration some months before it was filed. There was no exigency inhering in the subject-matter of the suit. The status complained of had existed ever since he himself opposed the contract in 1901. The only exigency that existed—if so it may be called—was by reason of the neglect of the plaintiff himself in delaying his request. His argument in justification, therefore, lacks both propriety and cogency, for his experience as a lawyer surely must have taught him that a reasonable time must be allowed a public officer, under such circumstances, to examine into the probable merits of such a suit; and that the "failure" contemplated by the statute, can be predicted only upon a refusal to act or an actual failure to do so beyond a reasonable time required for investigation, neither of which contingencies is shown in this case.

In a court of equity, diligence in asserting a right is always commended, and one who is shown to have slept upon his rights is often remitted to continued somnolence—out of court.

2. The cause has been fully argued on its merits; and as it is of much public importance, and a dismissal of the action upon grounds that do not involve decision upon the merits, might result in prolonged delays in litigation before reaching a final determination, the entire contention will be disposed of, so far as it may be done in this court, by

consideration of the merits of the cause, notwithstanding the objections hereinbefore discussed.

The plaintiff, in his final brief, summarizes his contention in these words:

"Of course the city's interests are to be considered. That is what this suit is for,—to determine whether any of its property can be turned over to the absolute control of a money-making corporation for thirty-five years to do a commercial and general railroad business, Such purpose is not germane to a water works system."

The petition alleges in substance: (1) That the Cincinnati, Georgetown & Portsmouth Railroad Company is operating a line of railway from Carrel street, Cincinnati, through the water works property to a point beyond, doing a common carrier business; and that said line was constructed through said water works grounds at the joint expense of the water works commissioners and the railroad company. (2) That the construction of said railway and its operation as a common carrier are by authority of said commissioners, but without authority of the board of legislation of the city, although said board of legislation is fully advised of the facts, and has taken no steps to prevent the diversion of the grounds and the operation of said railway. (3) That the railway company, unless enjoined, will continue so to operate for thirty years. Wherefore the court is asked to adjudge the said operation to be in contravention of the law and an abuse of the corporate powers of the city; and to enjoin the same and direct the removal of said track, "except as far as may be necessary for the necessary and lawful conduct and operation of the road through the said water works during construction, and thereafter."

It will be noted that there is here no claim that the taxpayer or the public are in any manner injured, either by increase of taxation or otherwise; nor that the permission or authority given the railroad company is in any way injurious to the interests of the city or the public, nor, indeed, that it is not beneficial to those interests. The

ordinary grounds of injury of a tangible nature, the prevention of which is the predicate of injunction proceedings, are wholly wanting. This action is based upon the bare statutory right without aid from extrinsic facts.

And it will be further noted that the sole ground of illegality claimed, excepting an allegation that the trackway over the waterworks property was constructed at joint private and public expense, is, that the board of legislation of the city has not given its consent to the authority derived by the company from the commissioners.

The so-called "commissioners of water works," styled also "trustees," in the act, were appointed by the governor of Ohio under the provisions of and with powers enumerated in R. S. 2435-1 to 2435-18, for the general purpose of providing a new and enlarged plant and system for the water supply of Cincinnati. To defray the costs and expenses of the work, they were authorized to borrow $6,500,-000 and subsequently (95 O. L., 821) $2,000,000 additional on behalf of the city, and issue bonds therefor signed by the president of said commissioners of water works and the city auditor.

The manifest purpose of the act, as evidenced by its terms, is to vest in said commissioners power to carry out a vast undertaking. They were to adopt plans and specifications providing for construction within or without the city limits, including a long list of enumerated things, and in addition "such other fixtures, appliances or facilities, as in their opinion are necessary." They are given full power to contract, and are relieved from the operation of special limiting statutes governing the city authorities in its contracting power. The full power of eminent domain of the city is vested in the commissioners relieved of the necessity of concurrent action of any other officer or board; and they are authorized to acquire, by purchase or condemnation, any real and personal property and franchises necessary for the work. The only expressed limitation relates to the mode of making certain contracts, taking vouchers for money payments, etc. It is also provided that upon final comple-

tion of the work, it shall be surrendered to the city board having charge of the water supply.

In considering the character of the powers granted under this act, I can but repeat here what I said in *Cincinnati* v. Railway, 14 Dec., 466, in the general term opinion (subsequently approved by the Supreme Court in 70 O. St. 476):

"As to the power of the trustees to be exercised under the act in question [referring to an act giving certain authority to the Southern railway trustees], we can entertain no doubt. Considering the important character of the trust, it is not to be supposed that it was ever intended by the Legislature to minimize and confine the powers of the trustees in the premises, but rather to amplify them to the full measure of the necessity; and, certainly, if it depended upon questions of mere statutory construction, we should feel constrained to apply the most liberal rules recognized by the practice of courts in such cases."

Nor is it to be supposed that in dealing with such a subject as that in question, the legislators were unaware that they were creating proprietary powers of a *quasi-private* nature for the private advantage of the inhabitants of the city of Cincinnati as a legal personality, and not powers of that other class relating more directly to purely governmental functions. In respect of the former powers, authorities charged with their exercise are trustees in fact, and governed by many of the considerations applicable to individuals under the responsibilities and duties of trust management. *Cincinnati* v. *Cameron,* 33 Ohio St., 336.

The distinction is a vital one in this case; and a consideration of the magnitude and complex character of the undertaking and a study of the text of the act creating the commission, which enumerates rather than defines the powers granted, suggests the familiar doctrine of "implied powers," as applicable, *ex necessitate,* and as fairly within the scope and intent of the act.

We pass now to a consideration of the contract in question in the light of the facts.

The water works commission, controlled by physical conditions of the territory in and contiguous to Cincinnati,

acquired a tract of land several miles above the city, fronting on the Ohio river, and extending thence back to and upon the hills that bound the river valley, thereby—it may be remarked in passing—controlling the Ohio side of the great natural highway of the valley of the Ohio, lying between the hills and the river, and connecting Cincinnati with the up-river cities and towns.

Obviously, one of the first problems of the situation that confronted the commissioners was that of transportation. The first and most vital of the "appliances" and "facilities" required at the outset of the work was a railway connection with the trunk lines entering Cincinnati, whereby car loads of heavy machinery and other structures, cast-iron pipes of large size, material and appliances of every description, required in the work by the commissioners or contractors, could be brought from mine, factory or quarry, situated anywhere in the United States, and delivered upon the grounds without breaking bulk. Without such facilities, and forced to depend upon the river or the only other then existing highway, a turnpike road, it would have been impossible to carry out the intended work within any practicable limit of cost.

The Cincinnati, Georgetown & Portsmouth Railroad, a narrow-gauge railway of limited capacity, was the only railway available. It connected with the Pennsylvania system, and through it with other leading railways of the country, at Carrel street about three miles away, and touched the water works property at the northwest corner. The commissioners very properly, and in order—to borrow the phrase of the Supreme Court—"to get everything ready to proceed to the construction," built a suitable railway track upon their property (so that the whole ownership and control thereof might be in the public as our law requires), and extended it by a necessary viaduct to the boundary line of the property at a point nearest the Cincinnati, Georgetown & Portsmouth railway. This was done upon the understanding embodied in the contract of August 5, 1898, under which the railway company proceeded to rebuild its track and appurtenances from a connection with

said water works viaduct to Carrel street, in order to bring in standard-gauge cars from other railways.

Unquestionably this arrangement was a most desirable one to the city, for not only was the contract in its terms in every respect favorable for the city, but in collateral aspects was beneficial in a far-reaching degree as an important factor in every contract for supplies of all kinds. Indeed, it was vital to the successful accomplishment of the entire work, and it must remain an important factor in the future maintenance of the system.

But a mere spur-extension into the water works grounds was soon found to answer but partialy the requirements of the situation. Officers, employes, contractors, workmen and the general public interested in the work, required more frequent and regular communication with the city than the railway company was justified in providing, upon the basis of the water works business alone.

The railway company, therefore, extended its line southeastwardly from the water works property to California and Coney Island, and the commissioners, by a contract dated December 10, 1901, leased to them, non-exclusively, for a term of years, the surplus use of the trackway through its property for general railroad purposes, and authorized them to plant poles and string wires for electrical propulsion, thereby enabling the company to run cars at frequent intervals and avoid the smoke and cinders that might be detrimental to the water supply.

Of this contract, which is the one in dispute in this case, it may be said (as also of the first contract), that so far from being in any way detrimental to the city's interests, it is in all respects highly beneficial. It will suffice here, without setting forth the contracts in full, to point out the salient features in connection with the objections urged.

Under the first contract the commissioners were to build a railway of standard and narrow gauge from their boundary line nearest the Cincinnati, Georgetown & Portsmouth railroad across the water works lands near the village of California (lying just beyond), and to keep in repair all embankments, bridges, trestles and piers of the railway so

constructed. The Cincinnati, Georgetown & Portsmouth Railroad Company were to reconstruct their railway from Carrel street station to connect with the railway thus built by the commissioners, and were to operate said railway from Carrel street to and upon the water works lands and switch cars from Carrel street under specified and very favorable rates, or a proportionate part of any through rate made direct to the water works terminus, and to pay on each car loaded in full or in part thus hauled, a certain price during the construction of the water works.

The second contract recites the first one, and contains a declaration of the commmissioners that the rights thereby provided for and as revised and modified by the second contract, are necessary for the construction and future maintenance of the works; grants permission and authority to the Cincinnati, Georgetown & Portsmouth Railroad Company to operate with the necessary equipment, the railway built by the commissioners over the water works property, to the village of California, and to construct certain portions of the track upon the water works lands which the commissioners had failed to construct as agreed, and maintain a passenger station on the grounds. It is provided that all track thus constructed on the grounds shall belong to the ꞏꞏ ck shall be maintained by the company. After completion of the water works, electricity only is to be used as a motive power in the operation of the railway.

Then follow minor provisions relating to the protection of the city's interests in various particulars, as conditions precedent to the continued operation of the railroad; and reservation of a right to permit the joint use of the tracks by any other railway. It limits the term of the grant or lease to thirty years; and provides for a car license during the construction of the water works and a flat rental of $500 per year thereafter in lieu of car licenses, with a reservation also of a right to terminate the lease at any time for failure of the railway company to comply with any of the conditions of the lease. There is also a restriction upon transfer of rights; an extension of switching rates as provided in the first contract, during the contin-

uance of the lease and requires a bond of $15,000 for faithful performance by the company.

By this second contract in addition to the mere delivery of freight cars upon the water works property, there was established a direct, speedy and frequent communication with the city—for the Cincinnati, Georgetown & Portsmouth railway also connects at Carrel street with the street car lines—by which the officers, workmen and the general public could reach the works at will and at small expense. In addition to this, baggage, express matter and mails are promptly interchanged with equal facility. To say that these things are not germane to a water works system, is to ignore the vital conditions incident to every large enterprise carried on by human labor.

The advantages accruing to the city, in respect to the multitude of persons necessarily employed in the work, in cheapening and rendering possible the securing of labor, were second only to those relating to the transportation of heavy freights from a distance; and the objections grounded on the want of connection between water works purposes and the operation of the railroad as a common carrier fall of their own weight.

But it is said further that the lease contract is *"ultra vires,"* and "invalid," because in the construction of the railway through the water works property there was a joint enterprise and an unlawful mingling of public and private funds; and further, in support of this contention, that it is "no part of a municipal function to provide railroad facilities," or "to turn over city property to the sole control of a railroad company and furnish a right of way over city grounds, and still less, to expend public funds thereon."

But this objection rests upon loose thinking, and a failure to observe the clear distinction hereinbefore pointed out between purely municipal or governmental and proprietary functions. It is quite clear from the terms of the contract in question that the ownership and control of the city property is carefully reserved to the public. What has been done was, and is, simply a leasing of the "surplus use," which does not in any way involve the city in a joint enter-

prise or in partnership relations of any kind whatever. It is also quite clear that the building of the railway over the grounds by the commissioners was necessary for reasons already pointed out.

The objection is based upon a manifest misstatement of the facts to support a misconception of the law, for it is obvious upon the actual facts that if the law were as embodied in the objection, every leasing of municipal property the use of which is not needed, would be equally a violation of the law. The distinction is very clearly pointed out in the case of this plaintiff against the city, based upon the water works law in question, and cited here in support of his contention. *Alter* v. *Cincinnati*, 56 Ohio St., 47, 64.

I may say, however, at this point, that the other counter-objection, namely, that arising upon the clause of the contract providing that when the track shall be taken up the material therefor shall belong to the company, is based upon a misconception of the contract. While the contract in that respect is possibly a little obscure, yet, inasmuch as the second contract is a mere revision and modification of the first, taking the two together it is clearly meant that the trackage built over this property and to be maintained by the railroad company, belongs to the city; that the material, which, in the event of tracks being taken up, shall belong to the company, can have reference only to material of an incidental nature.

I think that a fair construction of the clause in question, taken in connection with the similar clause in the first contract. Just what that material is, is the point of obscurity, but it is explainable upon the theory that the commissioners, with a view to the performance of their part of the first contract, may have collected some material which they intended to be used in the construction of their own track, as they had agreed to do; that is, material other than track proper, such as cross-ties, material for ballast, or what not, which was simply material which the track incidentally afforded, and which was of no particular value in itself.

But even if it were not so, under this contract the only occasion for taking up the rails would be after the conclu-

sion of the contract, and certainly, any material, whether trackage or anything else, which had to be maintained and consequently would have to be renewed by the railroad company, would by the expiration of that time have been fairly and equitably the property of the company and not the property of the city, because a period of thirty years' operation would wear out even rails. But while I do not think the construction to be given includes the rails, yet, even if it did, the familiar maxim of *de minimis non curat praetor* would apply. The matter is of such small account as to be a negligible quantity in this discussion.

In connection with the last mentioned objection it is also urged that the contract is invalid because the commissioners being a mere "building committee" have no authority to make a contract continuing beyond the period required for construction. But this rests upon no better foundation than the others.

In the exercise of purely governmental functions the authorities charged with them are bound to transmit the powers entrusted to them unimpaired to their successors, but in the exercise of proprietary functions, they are controlled by no such rule, because they act and contract for the private benefit of the municipality and its inhabitants, and may exercise their business judgment as private trustees might do. See 1 Dillon, Munic. Corp. (3d Ed.), Par. 27 and 66; *Cincinnati* v. *Cameron,* 33 Ohio St., 336, 367; *Safety Insulated Wire & C. Co.* v. *Baltimore (City),* 66 Fed. Rep. 140 (13 C. C. A., 375, 377; 25 U. S. App., 166).

It is clear that if facilities for transportation afforded by a railway are within the purview of the powers vested in the commission—and of this I think there can be no doubt in the present case—then, obviously, these facilities could be paid for out of the funds provided for the general purposes of the work. If no such facilities had existed, the necessity might possibly have justified the construction of a special line of railway at a very large expense; for it will be noted that the power to acquire franchises is expressly given in the act.

But, instead of thus expending the public money, except

for the trackage upon its own grounds, which was manifestly proper, the commissioners, very wisely, as appears, negotiated upon the basis of a mere permit or license, authorizing the use for a limited term of the idle increment of the trackage, for very great and continuing benefits to the city and the public in respect of the water works, present and future, and incidentally providing for the maintenance of the trackage by the lessee and a source of revenue therefrom to the city. Had the same thing been done by a board of directors of a private corporation as trustees for the stockholders, certainly praise, and not censure, would be freely accorded.

The language in the opinion of the case of *Pike's Peak Power Co.* v. *Colorado Springs*, 105 Fed. Rep. 1, 13 (44 C. C. A., 333), exactly applies. This was a decision rendered by Judge Sanborn of the Circuit Court of Appeals, and concurred in by all of the other judges. He says:

"Now, what is the real contention of the counsel for the city here? It is, that while the city council [water works commissioners] might lawfully have contracted for these public utilities, and have taxed its constituents, and have paid out their money to obtain them, it had no power to obtain them, it had no authority to procure them for, and to pay for them with the idle water power [surplus use of trackway] that existed in the water system of the city, without the expenditure of a dollar of the money of the citizens. It is, in fact, that municipal corporations hold all that part of public utilities · which they can not apply to customary municipal uses in trust to waste to the loss of their *cestuis que trustent,* and not in trust to use for their benefit. This proposition, when reduced to its last analysis, finds no support in reason or authority. * * * Municipalities and their officers have the power, and it is their duty, to apply the surplus power and use of all public utilities under their control for the benefit of their cities and citizens, provided, always, that such application does not materially impair the usefulness of these facilities for the purposes for which they were primarily created."

*Union Pac. Ry.* v. *Railway,* 51 Fed. Rep., 309, 321 (2 C. C. A., 174; 10 U. S. App., 98); affirmed by the U. S. Supreme Court in *Union Pac. Ry.* v. *Railway,* 163 U. S., 564 (16 Sup. Ct. Rep., 1173; 41 L. Ed., 265). *The Maggie P.,* 25 Fed. Rep., 202. See, also, *State* v. *Eau Claire (City),* 40 Wis., 533; *Green Bay & M. C. Co.* v. *Water-Power Co.,* 70 Wis., 635 (35 N. W. Rep., 525; 36 N. W. Rep., 828); *Bell* v. *Plattville (City),* 71 Wis., 139 (36 N. W. Rep., 831); *French* v. *Quincy,* 85 Mass. (3 Allen), 9; *Worden* v. *New Bedford,* 131 Mass., 23 (41 Am. Rep., 185); *Camden* v. *Camden (Vil.),* 77 Maine, 530, 537 (1 Atl. Rep., 681); *Hendee* v. *Pinkerton,* 96 Mass., 381, 386; Ch. App., 841-51; 8 H. L. Cas., 712. These are merely a few cases selected out of a very great number which are in full support of these propositions.

If the power to contract in the independent relation of trustees exists, the only question open to discussion concerning a given contract, would be whether, as shown by its terms and scope and the surrounding circumstances, it is an abuse of the powers of the trustees. The time involved in it is simply an element, like any other, to be considered in this connection. Whether or not rights granted under it extend beyond the tenure of the trusteeship, is an immaterial question, unless the contract be of such a nature as that the fact of such extension points to an abuse of power. In this case the time given does not seem to me unreasonable, especially in view of the right of condemnation that existed in favor of the company, independent of the contract.

Indeed, the whole question here is analogous to that involved in *McCulloch* v. *Maryland,* 17 U. S. (4 Wheat.), 316 (4 L. Ed., 579), where the Supreme Court of the United States, in considering the power of Congress under the Constitution to establish the United States Bank as an agency to facilitate the financial operations of the general government (Chief Justice Marshall delivering the opinion), held:

"If a certain means to cary into effect any of the powers expressly given by the Constitution to the government of

the Union, be an appropriate measure, not prohibited by the Constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance."

In the statutes under consideration, the commissioners are vested with full power to provide facilities appropriate to the work, and to make contracts.

There is, in the terms of the act, no limitation as to the time for which such contracts may run. For reasons already given, transportation facilities, such as can alone be afforded by a railway operating as a general common carrier, are distinctly within the general scope of the undertaking and are facilities contemplated by the act, by fair intendment, and to contract therefor is within the discretionary power of the commissioners. They have officially declared the necessity for the facilities secured by the contract in question; and I am clearly of opinion that, as such contract is not prohibited in the act, and as it involves no injury, but, on the contrary, is beneficial to the trust, it is within the discretionary power vested in them, is a proper exercise of that power and is not open to judicial question. For the same reasons, I am satisfied, also, that no action of the legislative body of the city was or is necessary to give it validity.

See, in support of these views, the opinion of the United States Circuit Court of Appeals in *Illinois Tr. & Sav. Bank* v. *Arkansas City,* 76 Fed. Rep., 271, 282 (22 C. C. A., 171; 40 U. S. App., 257).

It was stated in argument that the grant of a right of way through the water works property to the Cincinnati & Eastern railway, was confirmed by a formal ordinance of the board of legislation of the city. This fact can have no force as an argument here, because, among other reasons, while the permission of the commissioners was in that case necessary in the first instance, the character of the use may not have been so connected with the needs of the enterprise as to bring it fairly within the scope of their independent action, and hence might require the approval of the city authorities.

But we are not called upon to decide that question here.

For all reasons given, and upon full consideration both of the merits of the case and the special defenses urged, judgment must be rendered against the plaintiff; and in view of the circumstances attending the bringing of the suit, the judgment must be with costs; and it is so ordered.

Judgment dismissing the action at costs of plaintiff.

*C. J. Hunt,* Corporation Counsel, for city.

*J. B. Frenkel,* for water works commissioners.

*F. F. Dinsmore,* for railroad company.